24

# THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 1 9 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| DONALD LESLIE "SAM" GALBREATH | § | |
| | § | |
| vs. | § | C.A. NO. B-00-048 |
| | § | |
| PROMAR INC., *Individually & d/b/a* | § | ADMIRALTY / JURY DEMANDED |
| *COASTAL PRODUCTION SERVICES* | § | |

# THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DONALD LESLIE "SAM" GALBREATH | § | |
| | § | |
| vs. | § | C.A. NO. C-01-125 |
| | § | |
| PROMAR INC., *Individually & d/b/a* | § | ADMIRALTY / JURY DEMANDED |
| *COASTAL PRODUCTION SERVICES* | § | |

## DEFENDANT'S MOTION FOR CONSOLIDATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Promar Inc., Individually & d/b/a Coastal Production Services, the

Defendant in the above-referenced and numbered causes, and respectfully files and submits this its

Motion for Consolidation pursuant to Fed.R.Civ.P. 42 and would respectfully show unto this

Honorable Court as follows:



CHxPDF - www.fsxxio.com

I.

## INTRODUCTION

The Plaintiff in both actions is Donald Leslie "Sam" Galbreath.  The Defendant in both actions is Promar Inc., Individually and d/b/a Coastal Production Services.

In the instant case bearing Civil Action No. B-00-048, which was filed on or about March 31, 2000, the Plaintiff sued Defendant Promar for injuries to his neck, back, right shoulder and right arm as a result of pulling and/or lifting hatch covers aboard the M/V F.M. BROWN and/or the M/V LADY BECKY.  Please see copy of Plaintiff's First Amended Original Complaint filed in Civil Action No. B-00-048 which is attached hereto and fully incorporated by reference herein as if set forth at length as Exhibit "1".  The Plaintiff was employed by the Defendant as a deckhand aboard their vessels and brought causes of action under the Jones Act, under the general maritime doctrine of unseaworthiness and for the payment of maintenance and cure benefits under general maritime law. *Id.*

The newly filed case bearing Civil Action No. C-01-125 styled *Donald Leslie "Sam" Galbreath v. Promar Inc., Individually & d/b/a Coastal Production Services* was filed on or about March 21, 2001 in the United States District Court for the Southern District of Texas - Corpus Christi Division.  Please see copy of Plaintiff's Original Complaint in Civil Action No. C-01-125 attached hereto and fully incorporated by reference herein as if set forth at length as Exhibit "2".  A review of the caption of the pleadings as well as the content contained in both Complaints show that although they involve difference injuries they involve substantially the same subject matter, the same parties, the same vessel and contain the same causes of action.  Specifically, the Plaintiff alleges in the newly filed case that he was injured on or about April 18, 1998 aboard the M/V LADY BECKY as a result of his pulling and/or lifting the engine room hatch covers for the vessel in

2

question. *Id.* In addition, the Plaintiff asserts an unseaworthiness cause of action against the M/V LADY BECKY due to the quality, characteristics and function of the hatch covers of the vessel which appears to be identical to the allegations contained in the unseaworthiness cause of action asserted in the Plaintiff's First Amended Original Complaint filed in Civil Action No. B-00-048.

Defendant Promar Inc. d/b/a Coastal Production Services respectfully requests this Honorable Court to consolidate the newly filed lawsuit bearing Civil Action No. C-01-125 styled *Donald Leslie "Sam" Galbreath vs. Promar Inc., Individually & d/b/a Coastal Production Services* into the first filed lawsuit bearing Civil Action No. B-00-048 styled *Donald Leslie "Sam" Galbreath vs. Promar Inc., Individually & d/b/a Coastal Production Services* currently pending in the United States District Court for the Southern District of Texas - Brownsville Division.

II.

## ARGUMENT

A court may consolidate lawsuits if the suits relate to substantially the same subject matter and consolidation does not result in delay, jury confusion, or prejudice to the parties. *See Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1496 (11th Cir. 1985). Please see courtesy copy of *Hendrix v. Raybestos-Manhattan* attached hereto as Exhibit "3". Federal Rule of Civil Procedure 42 specifically allows this Court to consolidate the two cases. Fed.R.Civ.P. 42 (a) states as follows:

> "When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all of the matters in issues in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay".

The Fifth Court has encouraged trial judges to make good use of Rule 42(a) . . . in order to expedite the trial and eliminate unnecessary repetition and confusion. *Dupont v. Southern Pacific Co.*, 366 F.2d 193, 195 (5th Cir. 1966), cert. denied, 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed. 2d 106 (1967).

3

Please see courtesy copy of *Dupont v. Southern Pacific Co.* attached hereto as Exhibit "4". The later filed lawsuit bearing Civil Action No. C-01-125 is substantially the same because it involves exactly the same parties and arises out of substantially similar factual and legal issues. Plaintiff in both cases is claiming to have suffered an injury or injuries as a result of lifting engine hatch covers aboard the M/V LADY BECKY and the M/V F.M. BROWN.

The suits proposed to be consolidated are pending before this Court and another Court within the Southern District of Texas. This case was originally filed in March of 2000 in the Brownsville Division of the Southern District of Texas. The newly filed case bearing Civil Action No. C-01-125 was filed in the Corpus Christi Division of the Southern District of Texas.

The Court should consolidate Civil Action No. C-01-125 filed in the Corpus Christi Division styled *Donald Leslie "Sam" Galbreath vs. Promar Inc., Individually & d/b/a Coastal Production Services* with this suit for the following reasons:

(a)     The proceedings involve common parties. A review of the pleadings in both cases show that exactly the same parties are involved in both suits. To a great extent many of the witnesses will also be used in both cases.

(b)     The proceedings involve common issues of law and fact. Plaintiff has brought causes of action under the Jones Act, under the general maritime law of unseaworthiness and under the doctrine of maintenance and cure in both suits. The factual dispute concerning the engine hatch covers is identical in both cases. Plaintiff has brought actions against Defendant Promar alleging that the M/V LADY BECKY, owned and operated by Defendant Promar, was unseaworthy as a result of the condition of the engine hatch covers aboard the vessel. *Id.* The identical unseaworthiness allegation is made in both Complaints. *Id.* Furthermore, Plaintiff alleges an entitlement to the payment of maintenance and cure under general maritime law by Defendant Promar as a result of his

4

alleged injuries sustained aboard the vessel or vessels in question. *Id.* Therefore, a determination as to the entitlement to maintenance payments as well as the amount of maintenance, if any, would need to be made in both lawsuits based upon identical evidence. Both lawsuits contain allegations of negligence under the Jones Act against Defendant Promar due to the way in which the vessel was manned, equipped, operated and maintained apparently due to the condition of the engine hatch covers. Please see copy of Plaintiff's First Amended Original Complaint filed in Civil Action No. B-00-048 and Plaintiff's Original Complaint filed in Civil Action No. C-01-125 previously attached to this Motion as Exhibits "1" and "2", respectively.

(c)     Consolidation of the two cases should not result in any prejudice or confusion on the part of the jury as the issues involve identical parties and to a large extent the identical vessel in both cases. In addition, Defendant Promar contends that if any such risk of confusion exists it is far outweighed by the risk of inconsistent adjudication of common factual or legal issues given the tremendous overlap of both factual and legal issues in the cases. The issue concerning whether or not Defendant Promar was negligent under the Jones Act will center around whether or not Defendant Promar's conduct with regard to the hatch covers aboard the two vessels was unreasonable. This issue would be identical in both cases or at worst would be substantially similar. Plaintiff's claims that the M/V F.M. BROWN and the M/V LADY BECKY are unseaworthy center around the condition of the hatch covers, their weight and their design. While the new suit involves only one of the vessels, the unseaworthiness allegations contained in Civil Action No. C-01-125 would be identical to the unseaworthiness allegations concerning the hatch covers made in the instant lawsuit. Plaintiff's allegation that he is entitled to maintenance in a specific amount based upon his current wage, the value of benefits provided to him and his expenses would be identical in both cases. Given the fact that Plaintiff could have brought all of his causes of action currently split

5

into two separate lawsuits in his original proceeding in Brownsville, Defendant Promar believes there is little or no risk of prejudice or confusion in consolidating the two cases and, in fact, believes that one jury or one finder of fact hearing both cases will eliminate the risk of inconsistent decisions on factual and legal issues.

(d)     Consolidation will conserve judicial resources, will reduce the time and expense of trying the actions separately and will prevent inconsistent results.  Conducting two separate trials concerning substantially the same issues before two separate juries or two separate fact finders will be a tremendous waste of judicial resources for an already overburdened court system. Consolidation of the cases will add some time and expense to the instant lawsuit but would completely eliminate the latter filed case from the Court's docket in Corpus Christi without damaging or prejudicing in any way either of the parties involved in the two cases. Given the fact that Plaintiff and Defendant have requested a jury trial in both lawsuits there can be no doubt that a consolidated trial of both cases in Brownsville will eliminate the need for a second, approximately week long, jury trial in Corpus Christi which would be not only a burden on the Court but on those jurors requested to devote approximately a week of their time to a trial on the merits.  In addition, by consolidating the cases in Brownsville, Defendant Promar believes it will reduce both the time and expense required not only by the parties but by their attorneys of record in preventing duplicative discovery, duplicative hearings in both Brownsville and Corpus Christi and, of course, the time and expense of two separate trials over substantially related issues.  The delay caused by a consolidation would be far less time consuming, less costly, and more efficient than proceeding separately.

(e)     Plaintiff's counsel must admit that the two cases are nearly identical and that the discovery in the two cases will, in large part, be duplicative. As an example, please see correspondence from counsel for Plaintiff to counsel for Defendant dated April 16, 2001

supplementing discovery in <u>both</u> cases with photographs from a vessel inspection which is attached hereto and fully incorporated by reference herein as Exhibit "5".

For these reasons, Defendant Promar Inc., Individually & d/b/a Coastal Production Services asks this Court to consolidate Civil Action No. C-01-125 with Civil Action No. B-00-048 and order the Clerk of the Court to merge the two causes into one cause of action under Civil Action No. B-00-048 styled *Donald Leslie "Sam" Galbreath vs. Promar Inc., Individually & d/b/a Coastal Production Services* currently pending in the United States District Court, Southern District of Texas - Brownsville Division.

Defendant Promar requests an oral hearing on its Motion in order to more fully discuss the merits of consolidation and the relationship between the two cases.

WHEREFORE, PREMISES CONSIDERED, Defendant respectfully prays that upon due hearing, after hearing arguments of counsel, if any, this Honorable Court order a consolidation of Civil Action No. C-01-125 with Civil Action No. B-00-048 styled *Donald Leslie "Sam" Galbreath versus Promar Inc., Individually & d/b/a Coastal Production Services* currently pending before the United States District Court Southern District of Texas - Brownsville Division, and for any other and further relief to which the Defendant may show itself justly entitled to receive.

Respectfully submitted,

PIPITONE, SEGER & WATERHOUSE, P.C.
615 Upper North Broadway
M/T 89, Suite 1770
Corpus Christi, Texas 78477
(361) 884-4200
(361) 884-7444 (FAX)

By: _Rick Waterhouse_

    Richard B. Waterhouse, Jr.  Attorney in Charge
    Federal Bar No. 17995
    State Bar No. 00788624

ATTORNEYS FOR THE DEFENDANT
PROMAR INC., INDIVIDUALLY & D/B/A
COASTAL PRODUCTION SERVICES

## CERTIFICATE OF CONSULTATION

Counsel for the parties have discussed the Motion but were not able to reach an agreement.

Therefore, Defendant has filed this Motion and requests a hearing.

_Rick Waterhouse_
Richard B. Waterhouse, Jr.

## CERTIFICATE OF SERVICE

The undersigned attorney, as attorney of record for the Defendant, certifies that a true and

correct copy of the attached document has been served upon the following by the method of service

indicated on this the _18th_ day of April, 2001.

_Rick Waterhouse_
Richard B. Waterhouse, Jr.

8

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED:**

Mr. R. Blake Brunkenhoefer
R. BLAKE BRUNKENHOEFER, P.C.
American Bank Plaza
711 N. Carancahua, Suite 1000
Corpus Christi, Texas 78475
**CMRRR 7000 0520 0022 2914 7281**

# UNITED STATES DISTRICT COURT     SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DONALD LESLIE "SAM" GALBREATH | § § | CIVIL ACTION NO. B-00-048 |
| *versus* | § § | ADMIRALTY / JURY DEMANDED |
| PROMAR INC., *Individually & d/b/a* *COASTAL PRODUCTION SERVICES* | § § | |

## PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES DONALD LESLIE "SAM" GALBREATH, hereinafter identified as "Plaintiff," and makes and files this his First Amended Original Complaint, complaining of PROMAR INC. *Individually and d/b/a COASTAL PRODUCTION SERVICES*, hereinafter identified by name or described as "Defendant," and for cause of action would respectfully show unto the Court as follows:

### I.
### PARTIES

A.  Plaintiff, "SAM" GALBREATH, is an individual residing in Rockport, Texas.

B.  Defendant, PROMAR INC. *Individually and d/b/a COASTAL PRODUCTION SERVICES* has appeared and answered herein.  No service is necessary at this time.

### II.
### JURISDICTION

The jurisdiction of this Court is invoked pursuant to the following:

A.  Art. III, §2 of the United States Constitution (i.e., "all cases of admiralty and maritime

1



AUG 11 2000

jurisdiction");

**B.**      28 U.S.C. §1331 (i.e., "all civil actions arising under the Constitution, laws");

**C.**      28 U.S.C. §1333(1) (i.e., "any civil case of admiralty or maritime jurisdiction");

**D.**      28 U.S.C. §1916 (action by seaman, without pre-payment of costs, under the Judicial Code);

**E.**       46 U.S.C. §688, *et seq.* (a.k.a., the "Jones Act"); and,

**F.**      28 U.S.C. §1367 ("supplemental jurisdiction").  See also, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Nolan v. Boeing Co.*, 919 F.2d 1058, 1063 (5th Cir.1990).

### III.
### VENUE

**A.**      Plaintiff and Defendant are citizens and residents of the State of Texas and, more particularly, of the federal judicial district known as the Southern District of Texas.

**B.**      Pursuant to 28 U.S.C. §1391, venue is proper in the Brownsville Division of the Southern District of Texas.

### IV.
### OPERATIVE FACTS

**A.**      On or about mid-April, 1997, Plaintiff was aboard the M/V "F.M. BROWN" and/or the M/V "LADY BECKY" (hereinafter, the "vessels") in the course and scope of his employment by and for the vessels and their legal owner and operator, Defendant herein, having previously been engaged by contract of employment to serve as a deckhand for Defendants' fleet of vessels. [NOTE: Plaintiff's employment required him to work aboard each vessel for a few days, and then transfer to the other vessel.]

**B.**      On such date, while in the course and scope of his employment by and for the vessels and their owner/operator, and through the negligence of Defendant, its agents, servants, employees,

2

CSsPDF - www.fesna.com

representatives, or others for whom such Defendant was and is legally responsible, and/or the unseaworthiness of the vessels, Plaintiff sustained injuries to his neck, back, right shoulder and right arm as a result of his pulling and/or lifting the heavy, awkward, inadequately equipped, and poorly functioning hatch covers leading to the engine room of one of the vessels identified. [NOTE: The hatch covers of these two vessels were identical in their function and characteristics, including but not limited to their size, weight, and lack of appropriate equipment to facilitate their safe movement to the open or closed positions.]

C.     At or about this same time, Plaintiff also slipped and fell as he stepped down into the engine room of the M/V "F.M. BROWN," which additional incident contributed to and/or aggravated the aforementioned injuries.  This subsequent incident was caused by the lack of appropriate devices for entering and departing the engine room (i.e., the crew, including Plaintiff, had to step on top of the engine and thence to an oil can to get into the engine compartment as there was no ladder or stairs available).

D.     As a result of the aforesaid acts and/or omissions of Defendant, either singularly or in combination with one another, Plaintiff was caused to sustain serious and disabling injuries to his mind and body.

## V.
## CAUSES OF ACTION

A.     For each and every of the following allegations, Plaintiff hereby incorporates all facts presented in Paragraph IV of this First Amended Original Complaint, as well as any additional facts which may be presented in any paragraph hereinunder.

B.     **"JONES ACT" NEGLIGENCE**

1.     As a seaman and member of the crew of the vessels in question, Plaintiff was within

3

that class of persons protected by 46 U.S.C.A. §688, *et seq.*, known as the "Jones Act," which is cumulative of and supplemental to the General Maritime Law of the United States, the protection of which Plaintiff enjoys simply by virtue of his status as a seaman attached to and in the service of an identifiable vessel or fleet of vessels.

2.    Plaintiff was injured because of the negligence of Defendant in the way the vessel(s) was/were manned, equipped, operated, and maintained, as described in the preceding paragraphs.

3.    Plaintiff's injuries were caused/inflicted without any contributing fault or neglect on his part, and solely because of the negligence of Defendant, its agents, servants, employees, representatives, or others for whom Defendant is legally responsible.

4.    The negligent acts and omissions of Defendant were and are a proximate cause of the injuries and damages made the basis of this lawsuit.

C.    UNSEAWORTHINESS OF THE M/V "F.M. BROWN" and M/V "LADY BECKY"

1.    Plaintiff would further show that, at all times material to this cause, the M/V "F.M. BROWN" and M/V "LADY BECKY" were "unseaworthy," as that term is understood under the General Maritime Law of the United States.

2.    The unseaworthy condition of the vessels in question includes, but is not limited to, the quality and characteristics of the hatch covers of the two vessels and the entryway of the engine room of the M/V "F.M. BROWN," as described hereinabove.

3.    These and other conditions existed on or with the vessels, creating unseaworthy conditions (i.e., rendering the vessels unsafe for their ordinary and intended purpose) which were [a] producing cause(s) of the injuries and damages made the basis of this lawsuit.

D.    "MAINTENANCE & CURE"

As the Plaintiff was injured in the course and scope of his maritime employment by and for

4

the vessels in question and/or their owner, the General Maritime Law of these United States provides that the Plaintiff was and is entitled to receive "maintenance" and "cure" from the vessels and/or their owner.

## VI.
## DAMAGES

### A.    GENERAL

1.    By reason of the foregoing, Plaintiff has sustained painful and permanent injuries to his mind and body, said injuries being of such a nature and severity as to render him incapacitated from work.

2.    As a result of these injuries, Plaintiff will be unable to engage in any future activity of his vocation which demands the full use of his mind and body.

3.    As a result of the Defendant's conduct and/or the unseaworthiness of the vessels in question, as alleged, Plaintiff seeks to recover those damages provided by law, which include, but are not limited to, the reasonable and necessary medical expenses incurred by him to date; the reasonable and necessary medical expenses to be incurred by him in the future; physical pain and suffering that he has experienced in the past and will, in all reasonable probability, experience in the future; mental anguish that he has experienced in the past and will, in all reasonable probability, experience in the future; physical disfigurement; inconvenience; loss of earnings in the past; loss of wage earning capacity in the future; loss of physical capacity other than wage earning capacity; loss of life's enjoyments; and any and all other damages to which he may be entitled.

### B.    "MAINTENANCE" & "CURE"

1.    Under the General Maritime Law of these United States, Plaintiff was and is entitled to receive  adequate and timely "maintenance" and "cure" from the vessels and/or their owner, and

5

he now asserts his right to receive said adequate and timely maintenance and cure.

2.      Adequate maintenance has not been paid to Plaintiff.

3.      Upon the facts of this case, Plaintiff asserts his right to adequate maintenance in the amount of Forty Dollars ($40.00) per day, to be paid until such time as Plaintiff has achieved "maximum cure" from the injuries made the basis of this lawsuit.

4.      In addition, the vessels and/or their owner has/have failed and refused to provide adequate and timely "cure" in the manner required by the General Maritime Law of these United States. As a result of the vessels' and/or their owner's failure and refusal to pay adequate and timely cure benefits, Plaintiff has suffered great hardship, including, but not limited to, an exacerbation of the physical and mental injuries alleged herein.

5.      This failure and refusal to provide adequate and timely maintenance and cure to Plaintiff was and is wilful, arbitrary and capricious in nature.

C.      **ADDITIONAL DAMAGES, ATTORNEY'S FEES & EXPENSES**

Because of the vessels' and/or their owner's wilful, arbitrary and capricious failure and refusal to pay adequate and timely  maintenance and cure, Plaintiff is required to proceed to Court on the issue of maintenance and cure and ask for additional damages, reasonable attorney's fees and expenses.

## VII.
## DEMAND FOR TRIAL BY JURY

Plaintiff respectfully requests a TRIAL BY JURY, on all issues so triable.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that citation be issued and

served upon Defendant in the form and manner prescribed by law, requiring Defendant to appear and answer herein, and that, upon final hearing hereon, Plaintiff have

1.  Judgment against Defendant, for actual damages, including maintenance and cure;

2.  Pre-judgment interest, at the legal rate;

3.  Post-judgment interest, at the legal rate;

4.  Costs of Court;

5.  Costs of Suit; and

6.  All such other and further relief to which Plaintiff may be justly entitled, including, without limitation, attorney's fees and expenses.

Respectfully submitted,

R. BLAKE BRUNKENHOEFER, P.C.
American Bank Plaza
711 N. Carancahua, Suite 1000
Corpus Christi, Texas 78475
Tel:    (361) 888-6655
Fax:    (361) 888-5855

R. Blake Brunkenhoefer
State Bar No. 00783739
Southern District of Texas No. 15559

## CERTIFICATE OF SERVICE

I, R. Blake Brunkenhoefer, do hereby certify that a true and correct copy of the foregoing

*Plaintiff's First Amended Original Complaint* was duly served, in the form and manner indicated

below, upon

Daniel D. Pipitone         C.M./R.R.R. #7099 3220 0001 4295 5202
PIPITONE & SEGER
615 Upper N. Broadway, Suite 1770
Corpus Christi, Texas 78477

in accordance with all applicable provisions of the Federal Rules of Civil Procedure, on this the 10th

day of August, 2000.

R. Blake Brunkenhoefer

8

Case 1:00-cv-00048   Document 24   Filed in TXSD on 04/19/2001   Page 18 of 49



# UNITED STATES DISTRICT COURT    SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | |
|---|---|
| DONALD LESLIE "SAM" GALBREATH § | **C-01-125** |
| § | CIVIL ACTION NO. _____ |
| *versus* § | |
| § | **ADMIRALTY / JURY DEMANDED** |
| **PROMAR INC.,** *Individually & d/b/a* § | |
| *COASTAL PRODUCTION SERVICES* § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES DONALD LESLIE "SAM" GALBREATH, hereinafter identified as "Plaintiff," and makes and files this his Original Complaint, complaining of PROMAR INC. *Individually & d/b/a COASTAL PRODUCTION SERVICES,* hereinafter identified by name or described as "Defendant," and for cause of action would respectfully show unto the Court as follows:

### I.
### PARTIES

**A.**     Plaintiff, "SAM" GALBREATH, is an individual residing in Rockport, Texas.

**B.**     Defendant, PROMAR INC. *individually and d/b/a COASTAL PRODUCTION SERVICES and d/b/a PRODUCTION SERVICES GROUP,* is a Texas corporation which may be served by and through its registered agent: J. Winston Krause, 327 Congress Ave., Suite 600, Austin, Texas 78701.

### II.
### JURISDICTION

The jurisdiction of this Court is invoked pursuant to the following:

**A.**     Art. III, §2 of the United States Constitution (i.e., "all cases of admiralty and maritime

1

jurisdiction");

**B.**     28 U.S.C. §1331 (i.e., "all civil actions arising under the Constitution, laws");

**C.**     28 U.S.C. §1333(1) (i.e., "any civil case of admiralty or maritime jurisdiction");

**D.**     28 U.S.C. §1916 (action by seaman, without pre-payment of costs, under the Judicial

Code);

**E.**     46 U.S.C. §688, *et seq.* (a.k.a., the "Jones Act"); and,

**F.**     28 U.S.C. §1367 ("supplemental jurisdiction").  See also, *United Mine Workers v.*

*Gibbs*, 383 U.S. 715, 726 (1966); *Nolan v. Boeing Co.*, 919 F.2d 1058, 1063 (5th Cir.1990).

### III.
### VENUE

**A.**     Plaintiff and Defendant are citizens and residents of the State of Texas and, more

particularly, of the federal judicial district known as the Southern District of Texas.

**B.**     Pursuant to 28 U.S.C. §1391, venue is proper in the Corpus Christi Division of the Southern

District of Texas.

### IV.
### OPERATIVE FACTS

**A.**     On or about April 18, 1998, Plaintiff was aboard the M/V LADY BECKY (hereinafter, the

"vessel") in the course and scope of his employment by and for the vessel and its legal owner and/or

operator, Defendant herein, having previously been engaged by contract of employment to serve as

a deckhand for Defendant's fleet of vessels.

**B.**     On such date, while in the course and scope of his employment by and for the vessel and its

owner/operator, and through the negligence of Defendant, its agents, servants, employees,

representatives, or others for whom such Defendant was and is legally responsible, and/or the

unseaworthiness of the vessel, Plaintiff sustained a hernia as a result of his pulling and/or lifting the

2

heavy, awkward, inadequately equipped, and poorly functioning hatch covers leading to the engine room of the vessel in question.

C.    As a result of the aforesaid acts and/or omissions of Defendant hereto, either singularly or in combination with one another, Plaintiff was caused to sustain serious and disabling injuries to his mind and body.

**V.**
**CAUSES OF ACTION**

A.    For each and every of the following allegations, Plaintiff hereby incorporates all facts presented in Paragraph IV of this Original Complaint, as well as any additional facts which may be presented in any paragraph hereinunder.

B.    **"JONES ACT" NEGLIGENCE**

1.    As a seaman and member of the crew of the vessel in question, Plaintiff was within that class of persons protected by 46 U.S.C.A. §688, *et seq.*, known as the "Jones Act," which is cumulative of and supplemental to the General Maritime Law of the United States, the protection of which Plaintiff enjoys simply by virtue of his status as a seaman attached to and in the service of an identifiable vessel or fleet of vessels.

2.    Plaintiff was injured because of the negligence of Defendant in the way the vessel was manned, equipped, operated, and maintained, as described in the preceding paragraphs.

3.    Plaintiff's injuries were caused/inflicted without any contributing fault or neglect on his part, and solely because of the negligence of Defendant, its agents, servants, employees, representatives, or others for whom Defendant is legally responsible.

4.    The negligent acts and omissions of Defendant were and are a proximate cause of the injuries and damages made the basis of this lawsuit.

3

**C.**   **UNSEAWORTHINESS OF THE M/V LADY BECKY**

    **1.**    Plaintiff would further show that, at all times material to this cause, the M/V LADY BECKY was "unseaworthy," as that term is understood under the General Maritime Law of the United States.

    **2.**    The unseaworthy condition of the vessel in question includes, but is not limited to, the quality, characteristics and function of the hatch covers of the vessel, as described hereinabove.

    **3.**    These and other conditions existed on or with the vessel, creating unseaworthy conditions (i.e., rendering the vessel unsafe for its ordinary and intended purpose) which was a producing cause of the injuries and damages made the basis of this lawsuit.

**D.**   **"MAINTENANCE & CURE"**

    As the Plaintiff was injured in the course and scope of his maritime employment by and for the vessel in question and/or its owner, the General Maritime Law of these United States provides that the Plaintiff was and is entitled to receive "maintenance" and "cure" from the vessel and/or its owner.

**VI.**
**DAMAGES**

**A.**   **GENERAL**

    **1.**    By reason of the foregoing, Plaintiff has sustained painful and permanent injuries to his mind and body, said injuries being of such a nature and severity as to render him incapacitated from work.

    **2.**    As a result of these injuries, Plaintiff will be unable to engage in any future activity of his vocation which demands the full use of his mind and body.

    **3.**    As a result of the Defendant's conduct and/or the unseaworthiness of the vessel in

4

question, as alleged, Plaintiff seeks to recover those damages provided by law, which include, but are not limited to, the reasonable and necessary medical expenses incurred by him to date; the reasonable and necessary medical expenses to be incurred by him in the future; physical pain and suffering that he has experienced in the past and will, in all reasonable probability, experience in the future; mental anguish that he has experienced in the past and will, in all reasonable probability, experience in the future; physical disfigurement; inconvenience; loss of earnings in the past; loss of wage earning capacity in the future; loss of physical capacity other than wage earning capacity; loss of life's enjoyments; and any and all other damages to which he may be entitled.

**B.     "MAINTENANCE" & "CURE"**

1.      Under the General Maritime Law of these United States, Plaintiff was and is entitled to receive  adequate and timely "maintenance" and "cure" from the vessel and/or its owner, and he now asserts his right to receive said adequate and timely maintenance and cure.

2.      Adequate maintenance has not been paid to Plaintiff.

3.      Upon the facts of this case, Plaintiff asserts his right to adequate maintenance in the amount of Forty Dollars ($40.00) per day, to be paid until such time as Plaintiff has achieved "maximum cure" from the injuries made the basis of this lawsuit.

4.      In addition, the vessel and/or its owner has/have failed and refused to provide adequate and timely "cure" in the manner required by the General Maritime Law of these United States.  As a result of the vessel's and/or its owner's failure and refusal to pay adequate and timely cure benefits, Plaintiff has suffered great hardship, including, but not limited to, an exacerbation of the physical and mental injuries alleged herein.

5.      This failure and refusal to provide adequate and timely maintenance and cure to Plaintiff was and is wilful, arbitrary and capricious in nature.

## C.   ADDITIONAL DAMAGES, ATTORNEY'S FEES & EXPENSES

Because of the vessel's and/or its owner's wilful, arbitrary and capricious failure and refusal to pay adequate and timely maintenance and cure, Plaintiff is required to proceed to Court on the issue of maintenance and cure and ask for additional damages, reasonable attorney's fees and expenses.

## VII.
## DEMAND FOR TRIAL BY JURY

Plaintiff respectfully requests a TRIAL BY JURY, on all issues so triable.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that citation be issued and served upon Defendant in the form and manner prescribed by law, requiring Defendant to appear and answer herein, and that, upon final hearing hereon, Plaintiff have

1.   Judgment against Defendant, for actual damages,

   including maintenance and cure;

2.   Pre-judgment interest, at the legal rate;

3.   Post-judgment interest, at the legal rate;

4.   Costs of Court;

5.   Costs of Suit; and

6.   All such other and further relief to which Plaintiff may

   be justly entitled, including, without limitation, attorney's

   fees and expenses.

CVAPDF - www.fevia.com

Respectfully submitted,

R. BLAKE BRUNKENHOEFER, P.C.
American Bank Plaza
711 N. Carancahua, Suite 1000
Corpus Christi, Texas 78475
Tel:    (361) 888-6655
Fax:    (361) 888-5855

R. Blake Brunkenhoefer
State Bar No. 00783739
Southern District of Texas No. 15559

7

776 F.2d 1492                                **Page 1**
3 Fed.R.Serv.3d 1169, 19 Fed. R. Evid. Serv. 903, Prod.Liab.Rep. (CCH) P 10,890
(Cite as: 776 F.2d 1492)

United States Court of Appeals,
Eleventh Circuit.

Aubrey **HENDRIX**, et al., Plaintiffs-Appellees,
v.
**RAYBESTOS-MANHATTAN, INC.**, et al.,
Defendants-Appellants.

No. 82-8548.

Nov. 26, 1985.

Workers brought asbestosis action against asbestos manufacturers. The United States District Court for the Southern District of Georgia, B. Avant Edenfield, J., entered judgment against manufacturers, and they appealed. The Court of Appeals, Tjoflat, Circuit Judge, held that: (1) certain evidence pertaining to hazards created by asbestosis was admissible; (2) deposition of unavailable witness was admissible; and (3) it was reversible error to instruct jury that it could award damages for future medical expenses, necessitating remittitur.

Affirmed in part and reversed and remanded in part with instructions.

West Headnotes

**[1] Federal Civil Procedure** ☞**1953**
170Ak1953

A district court's decision under procedural rule [Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.] governing consolidation of cases is purely discretionary.

**[2] Federal Civil Procedure** ☞**1953**
170Ak1953

In exercising its discretion to consolidate cases, trial court must determine whether specific risks of prejudice and possible confusion are overborne by risk of inconsistent adjudications of common factual and legal issues, burden on parties, witnesses and available judicial resources posed by multipled lawsuits, length of time required to conclude multiple suits as against single one, and relative expense to all concerned of single trial, multiple trial alternatives. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[3] Federal Civil Procedure** ☞**1953**
170Ak1953

In exercising its discretion to consolidate cases, trial court must bear in mind extent to which risks of prejudice and confusion that might attend consolidated trial can be alleviated by utilizing cautionary instructions to jury during trial and controlling manner in which plaintiffs' claims, including defenses thereto, are submitted to jury for deliberation. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[4] Federal Courts** ☞**813**
170Bk813

The Court of Appeals will not disturb trial court's decision to consolidate cases unless it constitutes a clear abuse of discretion. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[5] Federal Civil Procedure** ☞**1953**
170Ak1953

Trial court's pretrial ruling to consolidate four asbestosis cases was entirely reasonable where workers were similarly situated in terms of manner in which they had been exposed to asbestos and extent of their disease, all had been insulators and worked out of same union hall, frequently on same jobs, their exposure to asbestos-containing insulation products had occurred during same time frame, each suffered from asbestosis and was being treated by same physician and their medical prognoses were nearly identical. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[6] Products Liability** ☞**14**
313Ak14

Under Georgia law, manufacturer's duty to warn may be breached by failure to take adequate measures to communicate warning to ultimate user or failure to provide warning that, if communicated, was adequate to apprise user of product's potential risks.

**[7] Evidence** ☞**146**
157k146

**[7] Products Liability** ☞**81.1**

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048   Document 24   Filed in TXSD on 04/19/2001   Page 26 of 49

313Ak81.1
    (Formerly 313Ak81)

Evidence of workmen's compensation claims prosecuted by employees of asbestos manufacturers who alleged they contracted asbestosis from inhaling dust on jobsite, personal injury suits brought by third parties who contended they acquired disease through exposure to asbestos dust, studies of industry workers that established direct relationship between amount of asbestos dust exposure and frequency and extent of asbestosis, medical, scientific, and trade literature on the asbestosis problem, and certain letters were admissible as relevant to issue of manufacturer's knowledge of harm that could be caused by asbestosis; probative value of evidence was not outweighed by potential for undue harm. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**[8] Evidence** ☞146
157k146

Because evidentiary rule [Fed.Rules Evid.Rule 403, 28 U.S.C.A.] permits exclusion of relevant evidence only when its probative value is substantially outweighed by potential for undue harm, rule favors admissibility of relevant evidence and should be invoked very sparingly to bar its admission.

**[9] Federal Courts** ☞628
170Bk628

Asbestos manufacturers failed to preserve for review on appeal issue that evidence that suggested causal relationship between asbestos worker's exposure to asbestos dust and chances of acquiring lung cancer should not have been admitted where manufacturers failed to present seasonable objection.

**[10] Federal Civil Procedure** ☞2011
170Ak2011

Decision of trial court to deny pretrial motion in limine so as to allow admission of evidence suggesting causal relationship between asbestos workers' exposure to asbestos dust and chances of acquiring lung cancer was within its discretion since trial court had no reason to believe that injured workers were misrepresenting quality of medical testimony they would present at trial.

**[11] Federal Civil Procedure** ☞1432.1

170Ak1432.1
    (Formerly 170Ak1432)

Deposition testimony of unavailable witness that witness, a physician employed by asbestos manufacturer, was aware of hazards associated with asbestos as early as 1944 and began warning officers of manufacturer of hazards in late 1940's was admissible, although manufacturer contended that the deposition was not taken in compliance with law and manufacturer had no opportunity to develop testimony by cross-examination; decision to limit cross-examination was a strategic choice. Fed.Rules Evid.Rule 804(b)(1), 28 U.S.C.A.

**[12] Federal Civil Procedure** ☞1432.1
170Ak1432.1
    (Formerly 170Ak1432)

As a general rule, a party's decision to limit cross-examination in discovery deposition is a strategic choice and does not preclude adversary's use of deposition at subsequent proceeding.

**[13] Evidence** ☞146
157k146

Testimony of unavailable witness, a physician for asbestos manufacturer, as to his awareness of hazards associated with asbestos may have been prejudicial but was highly probative and not so unfairly prejudicial as to preclude its admission in asbestos cases. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**[14] Federal Courts** ☞909
170Bk909

It was reversible error under Georgia law in asbestosis action to instruct jury that it could award workers damages for future medical expenses since there was no evidence upon which to base awards for future medical expenses, necessitating remittitur.

**[15] Federal Courts** ☞945
170Bk945

Appellate courts may order remittitur when reversible error has occurred and maximum effect upon amount of verdict due to error can with reasonable accuracy be determined.

**[16] Federal Courts** ☞945

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048   Document 24   Filed in TXSD on 04/19/2001   Page 27 of 49

170Bk945

Where there is no showing that jury's determination of liability was the product of undue passion or prejudice the Court of Appeals can order remittitur to maximum award the evidence can support.

**[17] Federal Courts** ⊙⊸**945**
170Bk945

Because power of the Court of Appeals to order remittitur is the same as that of the trial court, it may choose either to determine maximum award which evidence could support and suggest remittitur to that level, or remand to trial court for it to do so.

**[18] Damages** ⊙⊸**63**
115k63

When one of two joint tort-feasors settles with plaintiff and takes covenant not to sue, remaining tort-feasor, or defendant, is entitled to have credited against any damages that jury might find against it payment made by the other for the covenant not to sue, up to full amount, thereof.

**[19] Damages** ⊙⊸**63**
115k63

Loss of consortium claim, although derivative, was separate and distinct cause of action from husbands' claims in asbestosis action; thus, husbands' judgment would not be offset by amount spouses received in settlement of loss of consortium claim.

*1494 Michael V. Elsberry, Atlanta, Ga., for defendants-appellants.

Albert H. Parnell, Frank C. Bedinger, III, H. Lane Young & Sally D. Hauptfuhrer, Atlanta, Ga., for Johns-Manville Prod. Corp.

Richard K. Hines, Edgar A. Neely, Jr., Atlanta, Ga., For Raybestos-Manhattan.

Thomas H. Hart, III, Ronald L. Motley, Charles W. Patrick, Jr., Charleston, S.C., Jerry Phillips, Knoxville, Tenn., for plaintiffs-appellees.

Appeal from the United States District Court for the Southern District of Georgia.

Before TJOFLAT and HATCHETT, Circuit Judges, and GARZA [FN*], Senior Circuit Judge.

FN* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

Manville Corporation [FN1] and Raymark Industries, Inc. [FN2] appeal from money judgments entered in these diversity cases [FN3] pursuant to jury verdicts in favor of four workers in the insulation industry who contracted asbestosis, a progressive and incurable lung disease, as a result of handling appellants' asbestos insulation products. The jury found appellants liable to these workers on the theory that appellants had negligently failed to warn them that they could contract asbestosis if they failed to wear a respirator to prevent inhalation of the asbestos dust ordinarily generated by the routine handling of asbestos insulation products.

> FN1. Manville Corporation is the parent of a family of subsidiary corporations, including Johns-Manville Corporation. We will refer to it as "Johns-Manville" throughout this opinion.

> FN2. Raymark Industries, Inc. was formerly known as Raybestos- Manhattan, Inc. We will refer to it as "Raymark" throughout this opinion.

> FN3. The district court's jurisdiction over these cases was conferred by 28 U.S.C. § 1332(a)(1) (1982).

Appellants seek a new trial on several grounds. They do not question the sufficiency of the evidence to make out a case of negligent failure to warn or allege that the instructions under which this theory of liability was submitted to the jury were erroneous; [FN4] accordingly, this opinion will not address these issues. The only error the appellants assert that requires reversal is the district court's submission of the appellees' claims for future medical expenses to the jury. To remedy this error, we order remittiturs. The judgments are otherwise affirmed.

> FN4. Appellees' negligent failure to warn claim, and the elements thereof, is discussed in Part II., *infra*.

I.

Appellants' threshold position in this appeal is that,

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048 Document 24 Filed in TXSD on 04/19/2001 Page 28 of 49

in consolidating these cases for trial, the district court prevented appellants from receiving a fair trial. The gist of their argument is that the four cases were *1495 so factually dissimilar on the issues of liability and damages that a fair trial was impossible. Accordingly, we should set aside all four judgments and remand the cases for separate trials.

We begin our assessment of appellants' argument by consulting Fed.R.Civ.P. 42(a), and the cases applying it, which circumscribe a district court's authority to consolidate civil actions for trial. Rule 42(a) provides:

(a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

This rule is a codification of a trial court's inherent managerial power " 'to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.' " *In re Air Crash Disaster at Florida Everglades,* 549 F.2d 1006, 1012 (5th Cir.1977) (quoting *Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936)). [FN5] We have encouraged trial judges to "make good use of Rule 42(a) ... in order to expedite the trial and eliminate unnecessary repetition and confusion.' *Dupont v. Southern Pacific Co.,* 366 F.2d 193, 195 (5th Cir.1966), *cert. denied,* 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 106 (1967).

> FN5. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[1][2][3][4] A district court's decision under Rule 42(a) is purely discretionary. *In re Air Crash,* 549 F.2d at 1013; *Whiteman v. Pitrie,* 220 F.2d 914, 917-18 (5th Cir.1955). In exercising its discretion, the court must determine:

[W]hether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and

available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Arnold v. Eastern Air Lines, Inc.,* 681 F.2d 186, 193 (4th Cir.1982), *cert. denied,* 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983) and 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). The court must also bear in mind the extent to which the risks of prejudice and confusion that might attend a consolidated trial can be alleviated by utilizing cautionary instructions to the jury during the trial and controlling the manner in which the plaintiffs' claims (including the defenses thereto) are submitted to the jury for deliberation. We will not disturb a trial court's decision to consolidate unless it constitutes a clear abuse of discretion. *In re Air Crash,* 549 F.2d at 1013; *Whiteman,* 220 F.2d at 918.

When the district court consolidated these actions for trial, it had pending before it forty-four asbestosis cases. Each case had been brought by an individual (and, perhaps, his or her spouse) claiming to have contracted asbestosis as a result of inhaling asbestos dust on the job site. Some of these individuals had been exposed to the dust while engaged in the manufacture of asbestos-containing products; some, like the appellees, had been exposed while handling such products. Johns-Manville and Raymark were but two of several manufacturers of asbestos products sued in these cases.

[5] The court consolidated appellees' cases, over appellants' objection, because appellees were similarly situated in terms of the manner in which they had been exposed to asbestos and the extent of their disease. [FN6] All of the appellees, two of *1496 whom are brothers, were insulators and had worked out of the same union hall in Savannah, Georgia, frequently on the same jobs. Their exposure to asbestos-containing insulation products had occurred during the same time frame. Each suffered from asbestosis and was being treated by the same physician. Moreover, their medical prognoses were nearly identical.

> FN6. The court ordered the consolidation of these cases for trial at a pretrial conference held two months prior to trial. The court consolidated the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048  Document 24  Filed in TXSD on 04/19/2001  Page 29 of 49

cases because, as we note in the text, appellees' exposure to asbestos and the extent of their disease were similar and the liability theories of their claims were identical.

In deciding to consolidate appellees' claims for trial, the court rejected appellants' argument that the similarities of the claims were superficial and that the differences in appellees' exposure to asbestos dust would make it difficult for the jury to consider each claim on its own merits. To ensure that each claim would receive separate consideration, the court announced that it would adopt the following procedure at trial; each juror would be given a notebook, tabbed for each plaintiff and each defendant, and during the presentation of evidence the jurors would be given time, as necessary, to make notes.

In our view, the court's pretrial ruling to consolidate these cases was entirely reasonable. The four cases presented common issues of law and fact, and the factors we have referred to, *supra,* which inform a court's decision whether to consolidate, were duly considered. The striking similarity of these cases became even more apparent at trial, thus demonstrating the wisdom of the trial court's decision.

Appellee Aubrey Hendrix, age fifty-five, grew up on his parents' farm in south Georgia and quit school at the age of thirteen to help on the farm. He began working as an insulator in 1954 and was active in the trade, obtaining his job assignments from the local union hall, until 1963 when he took up farming. In 1970, he resumed work as an insulator until his retirement in 1980. Hendrix is nearly illiterate. He testified that, prior to 1979, when x-rays of his lungs disclosed asbestosis, he had no knowledge that asbestos dust presented a health hazard. His overall medical prognosis is bleak. In addition to suffering from asbestosis, Hendrix has high blood pressure, enlargement of the heart, high blood sugar, chronic bronchitis, and abnormal liver function. These other conditions have been caused in part by obesity and by smoking a pack of cigarettes a day for thirty-five years.

Appellee Wainwright Hendrix, Aubrey's brother, was fifty-two years of age at the time of trial. He attended school through the ninth grade and can read and write. Wainwright Hendrix began working out of the Savannah union hall as an insulator in 1952.

He worked numerous jobs in the south Georgia area, many with his brother and with the two other appellees. His only breaks from the trade, before retiring in 1981, occurred in 1960, when he was unable to find work for six months, and from 1971 to 1973. Wainwright Hendrix said he first learned of the dangerous propensities of asbestos dust in 1974 when he saw respirators at the job site. His health problems track those of his brother. Aside from asbestosis, he suffers from high blood pressure, angina, and emphysema. He also smoked cigarettes, the equivalent of fourteen "pack years," from 1951 until 1979.

Appellee Tyres D. Watson, sixty-three years of age, finished the eighth grade at age eighteen and is barely literate. After farming for five years in south Georgia, Watson got his first job as an insulator in 1946 and joined the union in 1949. He estimated that he worked between seventy-five and one hundred insulation jobs in his career. He retired from the trade in 1980. Watson testified that he had no knowledge of any health hazards associated with asbestos dust. Watson was a heavy smoker, having consumed the equivalent of forty "pack years" of cigarettes since the age of eighteen. In addition to a case of severe asbestosis, Watson suffers from asthma and chronic bronchitis.

Appellee William H. DeLoach, age fifty-one at trial, was the only one of the four appellees still employed as an insulator at the time of trial. DeLoach began working as an insulator in 1952 and joined the local union one year later. His only absence from the trade occurred from 1971 to 1974. He first learned of the health hazards associated with handling asbestos insulation in 1967 when the union began taking money out of his paycheck to support medical research. *1497 Like Aubrey Hendrix, DeLoach smoked a pack of cigarettes a day for thirty-five years. DeLoach has a moderately advanced case of asbestosis, emphysema, and asthma.

The district judge took considerable care during the trial to minimize any confusion that might result from trying the four cases together. At one point, for example, he cautioned the parties to present their evidence slowly so the jurors could make adequate notes. On at least four different occasions he gave a cautionary instruction, reminding the jurors that, during their deliberations, they would have to consider each of the plaintiffs' claims separately.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048   Document 24   Filed in TXSD on 04/19/2001   Page 30 of 49

In sum, the cases here present precisely the kind of tort claims a court should consider consolidating for trial. *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2384 (1971). A joint trial saved the appellants from wasteful relitigation, avoided duplication of judicial effort, and did not materially prejudice appellants' rights.

## II.

[6] The appellees' negligent failure to warn claims contained five elements. First, the process of installing asbestos insulation of the type manufactured by appellants created asbestos dust; second, those engaged in the installation process, such as appellees, stood a good chance of contracting asbestosis unless they wore a respirator; third, appellants had actual or constructive knowledge (i.e., they knew or should have known in the exercise of ordinary care) of these facts and thus had a duty to warn the workers thereof; fourth, appellants either issued no such warning or their warning was inadequate under the circumstances; and fifth, as a proximate result of such conduct, appellees contracted asbestosis. [FN7] At trial, the appellant manufacturers conceded the first two elements and chose the third element as their primary battleground. Their second claim of error concerns the trial court's receipt, over their objection, of certain evidence appellees introduced to prove that element.

FN7. In Georgia, whose substantive law provided the rule of decision in these diversity cases, a manufacturer's duty to warn "may be breached in either of two ways: (1) failure to take adequate measures to communicate the warning to the ultimate user, or (2) failure to provide a warning that, if communicated, was adequate to apprise the user of the product's potential risks." *Rhodes v. Interstate Battery System of America, Inc.*, 722 F.2d 1517, 1519 (11th Cir.1984). *See generally Ford Motor Co. v. Stubblefield*, 171 Ga.App. 331, 319 S.E.2d 470, 476 (1984).

Since the outset of this litigation, appellees have contended that appellants knew by the 1930's that there was a substantial incidence of pulmonary asbestosis among asbestos miners, [FN8] manufacturing plant workers who extract asbestos fiber from asbestos rock, [FN9] and textile millworkers who weave the fiber into cloth, [FN10] and that appellants should have known that there was a similar incidence of asbestosis among installers of

asbestos insulation. [FN11] Appellants' **\*1498** response has been that, prior to 1964, the asbestos industry had no reason to believe that insulation installers were likely candidates for asbestosis. As a result of a medical study published in 1964, the industry learned that such installers ran a substantial risk of contracting asbestosis. The parties thus framed the question for the jury: When, if ever, did appellants know, or have reason to know, of the asbestosis risk to insulation installers prior to 1964?

FN8. Asbestos originates, for the most part, in rock which has undergone an alteration resulting in a prismatic crystallization with a fibrous structure. Bowles, *Asbestos--General Information,* United States Department of the Interior, Bureau of Mines 4 (Information Circular 1935). Historically, miners have hammered the rock by hand to remove the crude asbestos fibers. Fulton, Dooley, Matthews & Houtz, *Asbestosis,* Department of Labor and Industry, Commonwealth of Pennsylvania, Bureau of Industrial Standards 5 (1936) [hereinafter cited as Fulton & Dooley, *Asbestosis* ].

FN9. At asbestos manufacturing plants, workers complete the removal of the asbestos fibers using several progressive processes. Fulton & Dooley, *Asbestosis,* at 5. The fibers are then prepared so that they may be spun into "yarn." Workers at manufacturing plants produce products such as asbestos paper, insulation, asbestos cement, shingles, lumber, and electrical fittings. *Id.* at 8.

FN10. Millworkers are essentially weavers who work at asbestos textile manufacturing plants. Weaving of asbestos "yarn" is done on looms in a manner similar to the method employed in weaving cotton, silk, or wool. Asbestos tape (for electrical insulation), cloth, and brake lining are woven. Fulton & Dooley, *Asbestosis,* at 8.

FN11. Insulators handle asbestos end-products, as distinguished from asbestos miners, manufacturing plant workers, and millworkers who handle raw forms of asbestos. Insulators use three types of asbestos products. The first is called pipe or boiler covering. Insulators beat, sand, saw, cut, and wire the pipe and boiler covering insulation before applying it. The second is called asbestos cement or mud. Insulators mix the dry asbestos cement, which has the consistency of flour, with water and then apply the pasty cement to pipes and boilers. The third type of product is asbestos insulating cloth, which is woven and looks like a canvas cloth material.

To prove appellants' pre-1964 knowledge, appellees

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048  Document 24  Filed in TXSD on 04/19/2001  Page 31 of 49

proffered the evidence now being challenged. This evidence included workmen's compensation claims prosecuted by mining and manufacturing employees of appellants who alleged that they contracted asbestosis from inhaling dust on the job site; personal injury suits brought by third parties who contended that they acquired the disease through exposure to asbestos dust; studies of industry workers that established a direct relationship between the amount of asbestos dust exposure and the frequency and extent of asbestosis; medical, scientific, [FN12] and trade literature addressing the asbestosis problem; and three letters from a collection of documents that has been referred to in asbestos cases as the "Sumner Simpson papers." [FN13]

> FN12. Between 1910 and 1959, some 550 medical and scientific articles were published about asbestos-caused disease. Approximately 100 more articles were published between 1960 and 1965.

> FN13. The "Sumner Simpson papers" consist of some 6,000 documents including correspondence, surveys, and memoranda, that date from the 1920's through the 1940's. The collection was compiled by Sumner Simpson, who, between 1929 and 1953, was president and later chairman of the board of Raymark. The papers were discovered in 1953 after his death.

Appellants objected to this evidence on two grounds. First, the evidence was alleged to be irrelevant because it did not explicitly address the issue of asbestosis among insulation installers, such as the appellees; second, if relevant, it should have been excluded because its "probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403. [FN14] The district court overruled appellants' objection on both grounds and allowed the appellees to present this evidence to the jury. The court cautioned the jury, however, that the evidence was being received for the limited purpose of determining whether appellants had actual or constructive knowledge that asbestos insulation posed an unreasonable risk of harm to installers routinely handling the product.

> FN14. Fed.R.Evid. 403 states:
> **Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time**
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[7] We agree with the trial court that the challenged evidence was relevant to the issue of appellants' knowledge. First, as appellants concede, there was overwhelming evidence that mining and manufacturing plant workers in the asbestos industry had a far greater susceptibility to asbestosis than the general population and that appellants knew this. Second, the record permitted the inference that workers handling asbestos insulation products were equally susceptible to the disease and that appellants had actual or constructive knowledge of this fact. A recital of some of the evidence before the jury bears this out.

In 1929, appellants commissioned a research study into the relationship between asbestos and lung disease to determine the effects of asbestos fiber on textile mill workers. They did so because of the mounting evidence of a link between asbestos exposure and the lung disease that had come to be known as asbestosis. The results *1499 of the study were published in 1935 by the United States Public Health Service [FN15] and indicated that prolonged exposure to asbestos dust caused a pulmonary fibrosis, asbestosis. The authors of the study recommended that the amount of asbestos dust in the air at asbestos processing plants be substantially reduced. Even before these results were published, officials of the appellant companies were aware of the hazards of asbestos dust exposure and were actively discussing the procedures the industry should follow to reduce dust levels at their facilities and to minimize potential liability to workers who became ill from breathing the dust. *See, e.g.,* Minutes of Meeting on Asbestos Dust Hazard in Manufacturing Operations, Johns-Manville Corp. (December 29, 1933); Letters between Vandiver Brown, general counsel of Johns-Manville Corp., and Sumner Simpson, president of Raymark (1935) (discussing publicity about British studies linking asbestos exposure to lung disease). A 1938 Public Health Service report concluded that the concentration of asbestos dust in the workplace should not exceed five million particles per cubic foot. This concentration became an industry standard that was followed until 1972, when the United States Department of Labor adopted and

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048    Document 24    Filed in TXSD on 04/19/2001    Page 32 of 49

began enforcing a stricter standard of five asbestos particles per cubic centimeter. [FN16]

FN15. The introduction to this study states:

In 1929 the Metropolitan Life Insurance Co. was approached by officials representing the asbestos industry in the United States, who were desirous of ascertaining whether asbestos dust was an occupational hazard in their establishments and, if so, what was the nature of this hazard and what should be done to prevent or control it.

About this time several articles had appeared in English medical journals describing a pneumoconiosis due to asbestos dust. While in one or two isolated instances the occurrence of this type of pneumoconiosis had been described in American journals, the industry itself appeared to be quite uninformed of the existence of any such occupational disease.

The hazard of silica dust, with special reference to the lungs, has long been appreciated, and a great deal of study and research has been applied to the problem (in the metal mining and certain other industries) in Great Britain, the United States, the British Dominions, and in other countries. ....

The name "asbestosis" has been applied to the pneumoconiosis caused by asbestos dust....

Lanza, McConnell & Fehnel, *Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers*, Pub.Health Rep., January 4, 1935, at 1.

FN16. In 1976, the Department of Labor further tightened this standard, reducing it to two particles per cubic centimeter.

The first major epidemiological study of asbestos insulation workers was released in 1946. In that study, called the Fleischer-Drinker report, [FN17] three Navy medical officers and a member of the United States Maritime Commission examined approximately 1,000 insulation workers employed in shipyards along the eastern seaboard during the waning years of World War II. They found only three cases of asbestosis. The study concluded that asbestos covering of naval vessels was a relatively safe operation. Significantly, only five percent of the workers studied had been employed in the asbestos insulation trade for ten years or more. Because asbestosis usually cannot be diagnosed for ten to twenty years after initial exposure, the authors' conclusion was severely criticized and discounted. No other epidemiological studies on insulation workers were performed in the United

States, however, until 1964, when the Selikoff study was conducted.

FN17. Fleischer, Viles, Gade & Drinker, *A Health Survey of Pipe Covering Operations in Constructing Naval Vessels*, 28 J.Indus. Hygiene & Toxicology 9 (1946).

The authors of the Selikoff study contradicted the findings of the Fleischer-Drinker report, concluding that "asbestosis and its complications are significant hazards among insulation workers in the United States." [FN18] They had examined 1,522 members of an insulation workers' union in the New York metropolitan area and found that half of them had asbestosis. Moreover, *1500 of those who had more than forty years' experience in the insulation trade, over ninety percent had pulmonary abnormalities traceable to asbestos exposure. The authors of the Selikoff study opined that the results of the earlier Fleischer-Drinker study were misleading because ninety-five percent of the workers in that study had been exposed to asbestos-containing products for less than ten years. Johns-Manville responded immediately to the Selikoff study by placing warning labels on packages of its asbestos-containing insulation products. Raymark began this practice in 1972.

FN18. Selikoff, Churg & Hammond, *The Occurrence of Asbestosis Among Insulation Workers in the United States*, 132 Annals N.Y.Acad.Sci. 139, 152 (1965).

Appellees produced evidence tending to show that, long before the findings of the Selikoff study were published, appellants were put on notice that end-product users such as insulation workers were contracting pulmonary lung disease as a result of their exposure to asbestos-containing products. Since 1930, medical literature has cited cases of asbestosis among insulation workers. Appellees produced a medical historian who, using research guides to medical and scientific literature that have been available since the 1920's, produced a list of more than 500 articles published between 1899 and 1965 concerning asbestos-caused disease. [FN19] That list included approximately ninety relevant case studies, twenty epidemiological studies, some of which dealt with persons who had used asbestos end-products rather than being involved in asbestos mining and manufacturing, and nine medical textbooks. From this master list, the historian

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048   Document 24   Filed in TXSD on 04/19/2001   Page 33 of 49

compiled a separate list of articles published prior to 1959 that mentioned the relationship between exposure to asbestos products and lung disease. The articles unearthed by the medical historian constituted only a portion of the information available to the asbestos industry, and thus to appellants, demonstrating a link between asbestosis and exposure to asbestos-containing products such as insulation.

> FN19. *See supra* note 12. The medical historian's list did not include all of the articles that had been published between 1899 and 1965.

The three letters from the Sumner Simpson papers introduced into evidence strengthened the inference that appellants knew, or at least should have known, well before the Selikoff study was published that users of their asbestos- insulation products ran a substantial risk of contracting asbestosis.     As described by the Fifth Circuit:

> The first letter, dated September 25, 1935, was written by A.F. Rossiter of *Asbestos* magazine to [Sumner] Simpson [then president of Raymark]. In this letter, Rossiter refers to previous requests made by Simpson that nothing be published in that magazine concerning the hazards posed by asbestos dust.  In the second letter, dated October 1, 1935, Simpson states to Vandiver Brown, Johns-Manville's attorney, that "the less said about asbestos, the better off we are."  Simpson in the same letter also refers to English articles on asbestos dust control and comments that *Asbestos* has "been very decent about not re-printing the English articles."    Finally, in the third letter, dated two days later, Brown replies:  "I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity."  He also suggests that, if they should decide eventually not to object to the publication of such an article, American instead of English data should be used on the theory that the asbestos dust was "considerably milder" in North America.

*Jackson v. Johns-Manville Sales Corp.,* 750 F.2d 1314, 1317-18 (5th Cir.1985) (en banc). [FN20]

> FN20. The complete text of the three letters reads as follows:
> 'ASBESTOS'
> Published by
> SECRETARIAL SERVICE
> 16th Floor, Inquirer Bldg.

> Philadelphia, PA., U.S.A.
> September 25, 1935
> Mr. Sumner Simpson, President,
> Raybestos-Manhattan, Inc.,
> Bridgeport, Conn.
> Dear Sir:
> You may recall that we have written you on several occasions concerning the publishing of information, or discussion of, asbestosis and the work which has been, and is being done, to eliminate or at least reduce it. Always you have requested that for certain obvious reasons we publish nothing, and, naturally your wishes have been respected.
> Possibly by this time, however, the reasons for your objection to publicity on this subject have been eliminated, and if so, we would like very much to review the whole matter in "ASBESTOS". Our thought is that we could either prepare from data which we have in our files, or obtain from Mr. W.A. Godfrey of the Cape Asbestos Company, London, who is much interested in the subject, an article on the work done in England and then follow it with an article written by someone in your organization, as to the work done here.
> We understand from Mr. Stover that your North Charleston plant, contains very complete dust control equipment and a description of such equipment, if you approve, would make a very interesting part of the article. Possibly even you could supply a photograph or two showing some part of this dust control equipment.
> We await with much interest your reply.  If there is no serious objection it would seem to be a most interesting subject for the pages of "ASBESTOS", and possibly a discussion of it in "ASBESTOS" along the right lines, would serve to combat some of the rather undesirable publicity given to it in current newspapers. Very truly yours,
> "ASBESTOS
> s/A.F. Rossiter
> A.F. Rossiter
> Bridgeport, Conn.
> Oct. 1, 1935
> ----------

> Mr. Vandiver Brown, Attorney
> Johns-Manville Corp.,
> 22 East 40th St.,
> New York City.
> My dear Mr. Brown:
> Enclosed is copy of a letter received from Miss Rossiter, of "Asbestos."
> As I see it personally, we would be just as well off to say nothing about it until our survey is complete. I think the less said about asbestos, the better off

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048  Document 24  Filed in TXSD on 04/19/2001  Page 34 of 49

we are, but at the same time, we cannot lose track of the fact that there have been a number of articles on asbestos dust control and asbestosis in the British trade magazines. The magazine "Asbestos" is in business to publish articles affecting the trade and they have been very decent about not re-printing the English articles. I shall be pleased to have your opinion in the matter.
Very truly yours,
President
SS-G
Enc.
----------

JOHNS-MANVILLE
Twenty-two East Fortieth Street
New York, N.Y.
October 3, 1935
Mr. S. Simpson, President.
Raybestos-Manhattan, Inc.,
Bridgeport, Conn.
My dear Mr. Simpson:
I wish to acknowledge receipt of yours of October 1st enclosing copy of the September 25th letter from the editor of the magazine "ASBESTOS". I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity. Even if we should eventually decide to raise no objection to the publication of an article on asbestosis in the magazine in question, I think we should warn the editors to use American data on the subject rather than English. Dr. Lanza has frequently remarked, to me personally and in some of his papers, that the clinical picture presented in North American localities where there is an asbestos dust hazard is considerably milder than that reported in England and South Africa. I believe the question raised by Miss Rossiter might well be considered at the committee meeting scheduled for next Tuesday, at which I understand both you and Mr. Judd will be present.
Very truly yours,
s/Vandiver Brown
Vandiver Brown
Attorney
VB:T

**\*1501** The appellants' next argument is that, assuming that this body of evidence intended to show appellants' actual or constructive knowledge of the unreasonable risk of harm asbestos insulation presented to installers, that evidence, especially the Sumner Simpson letters, should have been excluded under Fed.R.Evid. 403 because its probative value

was substantially outweighed by the danger of unfair prejudice and confusion. We are not persuaded.

[8] A trial judge's authority to exclude relevant evidence under Rule 403 is discretionary, which means that its exercise will not be disturbed on appeal absent a clear showing of an abuse of discretion. *United States v. Morano,* 697 F.2d 923, 926 (11th Cir.1983); *Stallworth v. Illinois Central Gulf Railroad,* 690 F.2d 858, 868-69 (11th Cir.1982). Rule 403 requires the judge to "balanc[e] the probative value of and the need for the evidence against the harm likely to result from its admission." Fed.R.Evid.**\*1502** 403 advisory committee note. *See also Noel Shows, Inc. v. United States,* 721 F.2d 327, 329 (11th Cir.1983). Because the rule permits the exclusion of relevant evidence only when its probative value is substantially outweighed by the potential for undue harm, the rule favors admissibility of relevant evidence and should be invoked very sparingly to bar its admission. *Wilson v. Attaway,* 757 F.2d 1227, 1242 (11th Cir.1985); *Collins v. Seaboard Coast Line Railroad,* 675 F.2d 1185, 1189 (11th Cir.1982). "Unfair prejudice" sufficient to warrant exclusion of relevant evidence must at a minimum have an "undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 advisory committee note. *See also Gross v. Black & Decker (U.S.), Inc.,* 695 F.2d 858, 863 (5th Cir.1983).

As we have stated *supra,* appellants were put on notice in the early 1930's of the causal relationship between asbestos dust and asbestosis, as well as the fact that miners, plant workers, and handlers of asbestos insulation were highly susceptible to the disease. The inference to be drawn from the "Sumner Simpson" letters was that, insofar as appellants were concerned, the less publicity about asbestosis the better. Aside from suggesting that this evidence was "too remote," appellants do not explain how it was "unfairly" prejudicial. The evidence was not inflammatory and, in view of the court's cautionary instructions, there was little possibility that it confused the issues or misled the jury. Moreover, appellants had ample opportunity, in their closing arguments to the jury, to ensure that the evidence was placed in its proper perspective. *See Jackson v. Johns-Manville Sales Corp.,* 750 F.2d at 1319; Fed.R.Evid. 403 advisory committee note.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048 Document 24 Filed in TXSD on 04/19/2001 Page 35 of 49

### III.

At trial, appellees introduced considerable evidence that suggested a causal relationship between an asbestos worker's exposure to asbestos dust and his chances of acquiring lung cancer. This evidence was presented through the testimony of five physicians who had published the statistical findings of various studies conducted among asbestosis victims. These findings, according to the physicians, indicated that exposure to asbestos results in "increased frequency and risk of lung cancer," that asbestos workers are in a "much higher risk group" to contract lung cancer, and that "well over fifty percent" of those with asbestosis die of lung cancer.

Appellees introduced this "cancer" evidence for two announced purposes: First, to establish a duty on appellants' part to warn those employed in the asbestos insulation trade that they stood a substantial risk of getting cancer if they did not wear a respirator while on the job; second, to show that appellees would probably suffer from lung cancer and should be compensated accordingly. Appellants contend that the cancer evidence tended to establish neither point and was therefore irrelevant. Moreover, appellants continue, this evidence had a highly prejudicial effect upon the jury, substantially tainting its verdicts. Appellants thus ask us to grant them a new trial as to each appellee.

Appellants' relevancy argument is persuasive. None of the appellees had cancer or established that he was reasonably certain to contract it in the future. Neither proved with reasonable certainty that he had incurred or would incur any medical expenses to monitor the cancer threat. The challenged evidence thus shed no light on the injury appellees had sustained or were likely to sustain as a result of appellants' alleged negligence.

[9] As for the duty to warn issue, the evidence was, at best, only marginally relevant and was subject to challenge under Fed.R.Evid. 403 on the ground that its probative value was substantially outweighed by the danger of unfair prejudice. The evidence was only marginally relevant because by the time the relationship between asbestos dust and lung cancer became sufficiently known to trigger a duty to warn, the risk of asbestosis and the manufacturers' commensurate duty to warn had already been established and workers were being informed that failure to wear a respirator could lead to a debilitating, progressive, *1503 incurable, and sometimes fatal disease of the lungs-- asbestosis. It is highly questionable whether those workers who, like appellees, failed to appreciate the manufacturers' warnings about asbestosis, would have heeded their warnings if they had also been told that asbestos exposure could lead to lung cancer. We need not determine, however, whether the trial judge should have excluded the cancer evidence under Rule 403, because appellants failed to preserve the point by presenting a seasonable objection.

The only objection appellants made to the introduction of this evidence occurred prior to trial. At that time, they moved the court *in limine,* pursuant to Fed.R.Civ.P. 16(c)(3), [FN21] for a protective order excluding the evidence. Appellants asserted that appellees could not demonstrate a significant relationship between asbestos dust and lung cancer and that their sole purpose in introducing the evidence would be to inflame the jury. At a hearing on the motion, the court inquired of appellees' counsel as to what they expected their cancer evidence to prove. Counsel stated that their medical experts would opine that appellees, though not presently suffering from lung cancer, would acquire it in the future. The cancer evidence, therefore, would be a significant part of their proof on the issue of damages. Counsel also stated that the evidence would be probative of the third element of their negligent failure to warn claim, that appellants knew of the health hazards associated with the installation of asbestos insulation at the time appellees were being exposed to the asbestos products. Faced with these representations, the court denied appellants' motion for a protective order.

FN21. Fed.R.Civ.P. 16 provides in pertinent part:
**Rule 16. Pretrial Conferences; Scheduling; Management**
....
**(c) Subjects to be Discussed at Pretrial Conferences.** The participants at any conference under this rule may consider and take action with respect to
....
(3) ... advance rulings from the court on the admissibility of evidence....

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The court's ruling did not relieve appellants of the obligation to question the relevancy of the challenged evidence at trial if, for example, the medical experts could not say with the requisite reasonable medical certainty that appellees did or would have cancer or that they would incur medical expenses in the effort to avoid the disease. Nor did the court's ruling relieve appellants of the duty to make a Rule 403 objection if it appeared that the evidence, though relevant, contained the seeds of undue prejudice or would confuse or mislead the jury. When appellees' medical experts were unable to say that appellees had or would have cancer or even that they would incur medical expenses to guard against it, appellants should have objected. Inexplicably, they chose not to object. The only question before us, therefore, is whether the district court erred in denying appellants' pretrial motion *in limine*.

[10] The decision whether to grant or deny appellants' pretrial motion was a discretionary one. In this instance, the court acted well within its discretion, reaching its decision after extensive argument of counsel. The court cannot be faulted for relying on the representations of appellees' counsel that they could prove, with reasonable medical certainty, that their clients would contract lung cancer. The parties had engaged in extensive discovery, and the court had no reason to believe, save appellants' conclusory assertions to the contrary, that appellees were misrepresenting the quality of the medical testimony they would present at trial. Litigation lawyers, as officers of the court, are obliged to make truthful representations of fact and law to the court. Model Code of Professional Responsibility DR 7- 102(A)(5) (1980): *see also* Model Code of Professional Responsibility EC 7- 25 (1980). As appellants correctly state, trial judges should hold attorneys to the statements they make in a pretrial conference. 6 C. Wright & A. Miller, Federal Practice and Procedure § 1527 (1971); *cf. United States v. Tampa Bay Garden Apartments, Inc.*, 294 F.2d 598, 606 (5th Cir.1961). *Laird v. Air Carrier *1504 Engine Service, Inc.*, 263 F.2d 948, 953 (5th Cir.1959).

This, however, did not excuse appellants' failure to bring the matter to the court's attention if they wished the court to take some action. They certainly had ample opportunity to do so. At trial, when appellees' counsel began to question their medical experts about the relationship between asbestosis and lung cancer, appellants did not ask the court for leave to inquire of the witnesses, in the absence of the jury, as to whether they could prognosticate with reasonable medical certainty that any of the appellees had or would contract cancer. Rather, they simply stood by and allowed appellees' counsel to elicit testimony that the incidence of lung cancer is substantially greater in asbestosis victims than it is in the general population. Significantly, the medical experts offered no opinion as to appellees' chances of getting cancer. In fact, only one expert was even asked for such an opinion, and he stated that he could not give one. At the close of the direct examination of these experts, appellants did not move to strike their testimony as irrelevant, but simply proceeded with cross-examination.

Appellants had two subsequent opportunities to raise challenges to the admissibility of the cancer evidence. They could have moved the court, at the close of the plaintiffs' cases in chief, to strike the evidence from the record, and they could have requested the court, at the close of all the evidence, to instruct the jury to disregard the cancer evidence. Appellants bypassed both of these opportunities.

We have cautioned lawyers against blind reliance on a motion *in limine* to preserve the sort of objection appellants press here. The caution bears repeating:

The overruling of a motion in limine is not reversible error; only a proper objection at trial can preserve error for appellate review.... Motions in limine are frequently made in the abstract and in anticipation of some hypothetical circumstance that may not develop at trial. When a party files numerous motions in limine, the trial court may not pay close attention to each one, believing that many of them are purely hypothetical. Thus, a party whose motion in limine has been overruled must object when the error he sought to prevent with his motion is about to occur at trial. This will give the trial court an opportunity to reconsider the grounds of the motion in light of the actual--instead of hypothetical--circumstances at trial.

*Collins v. Wayne Corp.*, 621 F.2d 777, 784 (5th Cir.1980) (citation omitted); *see also United States v. Traylor*, 656 F.2d 1326, 1333 n. 6 (9th Cir.1981) ; Fed.R.Evid. 103(a)(1); 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 103[02] (1985).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048  Document 24  Filed in TXSD on 04/19/2001  Page 37 of 49

### IV.

Appellants contend that the district court erred when it admitted into evidence portions of the deposition testimony of Dr. Kenneth Smith, Johns-Manville's former medical director. The deposition was taken in 1976 in Pittsburgh, Pennsylvania, as part of the pretrial discovery proceedings in *DeRocco v. Forty-Eight Insulation, Inc.,* No. 7407-2880 (Ct. of Common Pleas Allegheny County, Pa. filed July Term 1974), an asbestosis case brought by several steel workers. Johns-Manville was one of the defendants in that case; Raymark was not. Dr. Smith, a physician, had been employed by Johns-Manville from 1944 to 1966, with the exception of one year. He started out as the medical director of its Canadian subsidiary and in 1952 became medical director of all of the Johns-Manville companies, a position he occupied until 1966 when he retired. Dr. Smith died in 1977, a year after his deposition was taken in *DeRocco.*

Dr. Smith testified that he was aware of the hazards associated with asbestos as early as 1944 and that he began warning Johns-Manville's officers of such hazards in the late 1940's. He had found that the risk of asbestos dust exposure was the same for insulation workers as it was for asbestos miners and plant workers. In 1952, he recommended that Johns-Manville place caution labels on its insulation products containing asbestos.

**\*1505** Dr. Smith's testimony was clearly pertinent to the third element of appellees' negligent failure to warn claims against Johns-Manville. The district court accordingly admitted Dr. Smith's testimony, over Johns-Manville's objection, with a cautionary instruction that the jury was to limit the testimony to appellees' claims against that defendant. Raymark voiced no objection to the admission of the testimony or the adequacy of the court's cautionary instruction; hence, it cannot now object. *See* Fed.R.Evid. 103(a)(1). Our review is therefore limited to the merits of Johns-Manville's objection.

Johns-Manville argues that Dr. Smith's deposition testimony was inadmissible for two independent reasons. First, it did not meet the standard set by Fed.R.Evid. 804(b)(1), [FN22] which governs the admissibility of testimony given in the course of a prior proceeding by a witness who has become unavailable. Second, assuming that the deposition testimony satisfied Rule 804(b)(1), the court should

have excluded it under Fed.R.Evid. 403 because its probative value was substantially outweighed by the danger of unfair prejudice. We reject Johns-Manville's argument.

> FN22. Fed.R.Evid. 804(b)(1) states, in pertinent part:
> **Rule 804. Hearsay Exceptions; Declarant Unavailable**
> ....
> **(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: **(1) Former testimony.** Testimony given as a witness ... in a deposition taken in compliance with law in the course of ... another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

[11] Rule 804(b)(1) provides that deposition testimony of an unavailable witness, which Dr. Smith had become, given "in compliance with law in the course of another proceeding" is not excludable hearsay "if the party against whom the testimony is [being] offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Johns-Manville contends that Dr. Smith's deposition, which was taken by the *DeRocco* plaintiffs, should have been excluded as hearsay because the deposition was not taken in compliance with law and it either had no opportunity to develop Dr. Smith's testimony by cross-examination or, if it had one, it was not motivated to cross-examine Dr. Smith to the extent that it would have been had he appeared to testify in appellees' cases.

Our review of Johns-Manville's Rule 804(b)(1) argument is somewhat hindered because the record concerning the admission of Dr. Smith's deposition testimony is not complete. Rather, it is limited to the deposition itself and the trial judge's perfunctory statement, made at the pretrial conferences, denying Johns-Manville's *in limine* motion to exclude the testimony. [FN23] For example, there is no evidence in the record to support Johns-Manville's claim that the deposition was not taken "in compliance with law." The transcript of the deposition proceeding discloses no such infirmity; in fact, it does not even contain a challenge by Johns-Manville to that effect. On the contrary, it appears that the *DeRocco* plaintiffs deposed Dr. Smith in conformance with Pennsylvania law.

Case 1:00-cv-00048  Document 24  Filed in TXSD on 04/19/2001  Page 38 of 49

Johns-Manville's first alleged Rule 804(b)(1) deficiency accordingly fails.

> FN23. Prior to trial, Johns-Manville moved the court in all of the pending asbestos cases to bar the plaintiffs from introducing Dr. Smith's deposition into evidence, asserting the same Fed.R.Evid. 804(b)(1) grounds now presented. The record before us does not include a definitive ruling by the district court on the motion. The record indicates that the court, in a pretrial hearing in several of the other cases, stated that the plaintiffs could use the deposition to prove their claims against Johns-Manville. During the pretrial conference in appellees' cases, the trial court stated that it had already ruled on the deposition's admissibility in the other cases and that it would adhere to that ruling.

Johns-Manville's claim that it had no opportunity to cross-examine Dr. Smith requires no discussion; it is conclusively contradicted by the transcript of the deposition itself. Johns-Manville's alternative claim, that it was not motivated to cross-examine the witness as it would have been had it *150¢ known that appellees would seek to introduce his deposition in these cases, requires some discussion. Johns-Manville says that it lacked an equivalent motive for two reasons: first, the deposition was taken for discovery purposes only; second, the plaintiffs' claims in *DeRocco* differed from appellees' claims. The second reason is not persuasive because the *DeRocco* plaintiffs, like the claimants here, were asbestosis victims seeking compensation for exposure to asbestos dust.

[12] Turning to the first reason, we note that, as a general rule, a party's decision to limit cross-examination in a discovery deposition is a strategic choice and does not preclude his adversary's use of the deposition at a subsequent proceeding. *See Wright Root Beer Co. v. Dr. Pepper Co.,* 414 F.2d 887, 890 (5th Cir.1969); 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 804(b)(1)[02], at 804-75 (1985); *cf. Gill v. Westinghouse Electric Corp.,* 714 F.2d 1105, 1107 (11th Cir.1983) ("pretrial depositions are not only intended as a means of discovery, but also serve to preserve relevant testimony that might otherwise be unavailable for trial" ). Johns-Manville has provided us with nothing to indicate that the Pennsylvania courts were not following this rule at the time Dr. Smith was deposed. We thus conclude that Johns-Manville's counsel took a calculated risk

in limiting his cross-examination of the witness.

[13] Johns-Manville's argument that Dr. Smith's testimony was inadmissible because its unfair prejudice and risk of confusion outweighed its probative value is also unpersuasive. The evidence was highly probative and indeed prejudicial, but it was not unfairly prejudicial and nothing about it was confusing or misleading.

V.

Appellants contend that the trial court erred in instructing the jury that it could award the plaintiffs damages for future medical expenses because there was no evidence from which the jury could calculate such damages with reasonable certainty. The court's instruction was erroneous and, in our view, so misled the jury that it constituted reversible error. *See Pesaplastic, C.A. v. Cincinnati Milacron Co.,* 750 F.2d 1516, 1525 (11th Cir.1985) (appellate court must look at "whether the charges, considered as a whole, sufficiently instruct the jury so that jurors understand the issues involved and are not misled" ).

The voluminous transcript of the sixteen-day trial in this case reflects only one piece of evidence concerning appellees' future medical expenses, a statement by Dr. Bashir Chaudry, a physician who examined the four appellees at the behest of the appellants. Dr. Chaudry was called as a defense witness. On cross-examination, he estimated that the cost of his examination, including x-rays, of each of the appellees was about $250. Dr. Chaudry, and the other physicians who testified, said that the appellees should receive future medical attention, but he, like the others, failed to indicate what the cost of such attention might be.

At the close of all the evidence, appellants moved the court to strike appellees' claims for future medical expenses, contending that the evidence was too speculative to allow an award for such expenses. The court's initial reaction was to grant their motion. When appellees' counsel pointed out that the testimony had established that their clients would need future medical attention, however, the court decided to submit the issue to the jury. With this ruling in hand, appellees' counsel, in their closing arguments, urged the jury to award damages for future medical expenses. Counsel suggested that Aubrey Hendrix's future medical expenses would

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

amount to $4,250 and that Wainwright Hendrix's would be $4,750. Counsel arrived at these figures by multiplying $250, the estimated cost of Dr. Chaudry's pretrial examination, by seventeen and nineteen respectively, the Hendrixes' life expectancies in years. In an apparent oversight, counsel made no specific recommendation as to the amount the jury should award Tyres D. Watson and William H. DeLoach. Counsel did argue, however, that "the money award of each man has got to be enough so that each of them will *1507 never have to worry again about ... how they are going to pay their bills" and provided the jury with a formula for determining their future medical expenses, which called for multiplying the appellee's life expectancy by $250. Because Watson had a life expectancy of twelve years and DeLoach was expected to live about twenty years, counsel in essence urged the jury to award them future medical expenses of $3,000 and $5,000, respectively.

[14] Georgia law requires a claimant to prove with reasonable certainty not only that he will sustain future medical expenses, but also the amount of such expenses. *See Wayco Enterprises, Inc. v. Crews,* 155 Ga.App. 775, 272 S.E.2d 745, 747 (1980); *Jordan v. Ensley,* 149 Ga.App. 67, 253 S.E.2d 414, 416-17, *aff'd,* 244 Ga. 435, 260 S.E.2d 480 (1979). "Where a party sues for damages, he has the burden of proof of showing the amount of loss in a manner in which the jury ... can calculate the amount of the loss with a reasonable degree of certainty. An allowance for damages cannot be based on guess work." *Big Builder, Inc. v. Evans,* 126 Ga.App. 457, 191 S.E.2d 290, 291 (1972) *see Tendrift Realty Co. v. Hayes,* 140 Ga.App. 896, 232 S.E.2d 169, 169 (1977). It is error for a trial court to submit a claim for future medical expenses to the jury if, to make an award, the jury must engage in sheer speculation. *See Wayco Enterprises,* 155 Ga.App. 775, 272 S.E.2d at 747; *Hughes v. Brown,* 109 Ga.App. 578, 136 S.E.2d 403, 404 (1964).

[15] In the cases at hand, the jury had no evidence upon which to base awards for future medical expenses. Counsel's recommendations were not evidence; nor did they represent permissible inferences from the evidence. No witness testified with any degree of certainty as to how often any of the appellees would have to see a physician in the future or the nature or extent of the treatment that might be required. Dr. Chaudry gave no indication that the cost of any such examination or treatment would be comparable to what he had charged for his initial examination. In short, no witness predicted appellees' future medical expenses with any degree of certainty. Because appellees failed to carry the burden of proof on this issue, it should not have been presented to the jury. The court erred in submitting it, and the error was prejudicial.

Having concluded that the court's instruction on future medical expenses constituted prejudicial error, we must determine the appropriate remedy. Appellants argue that the remedy should be a new trial. They overlook the alternative remedy of a remittitur, which not only accomplishes justice but also promotes economy for the courts and the parties.

[16] Appellate courts may order a remittitur when reversible error has occurred
> and the maximum effect upon the amount of the verdict due to the error can with reasonable accuracy be determined. The use of remittitur enables the court and the parties to avoid the delay and expense of a new trial, and ... furthers the legitimate objective of bringing litigation to as speedy and expeditious end as is reasonable.

6A J. Moore, J. Lucas & G. Grotheer, Moore's Federal Practice ¶ 59.08[7], at 59-189 (2d ed. 1985) (footnote omitted).

[17] The rule in this circuit is that, where there is no showing that the jury's determination of liability was the product of undue passion or prejudice, we can order a remittitur to the maximum award the evidence can support. *See Carlton v. H.C. Price Co.,* 640 F.2d 573, 582 n. 14 (5th Cir.1981); *Howell v. Marmpegaso Compania Naviera,* 536 F.2d 1032, 1034-35 (5th Cir.1976). Because our power to order a remittitur is the same as that of the trial court, *Carlton,* 640 F.2d at 582 n. 14, we may choose either "to determine the maximum award which the evidence could support and suggest a remittitur to that level, or to remand to the trial court for it to do so." *Howell,* 536 F.2d at 1034-35. Ordinarily, we will direct the district court on remand to order a remittitur or, at the option of the plaintiff, grant a new trial on the issue of damages. *Stewart & Stevenson Services, Inc. v. Pickard,* 749 F.2d 635, 650 n. 18 (11th Cir.1984) *see Wilson v. Taylor,* 733 F.2d 1539, 1550 (11th Cir.1984). *1508 But when the error is obvious and the correction mechanical, we have avoided the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048   Document 24   Filed in TXSD on 04/19/2001   Page 40 of 49

unnecessary step of remanding the issue to the district court and have fixed the remittitur ourselves. *See Ferrero v. United States,* 603 F.2d 510, 515 (5th Cir.1979).

In the interest of justice and judicial economy, we order a remittitur of appellees' verdicts. We take this action because the amounts of the remittiturs are small and fairly ascertainable, the cost of a new trial on the issue of damages would be prohibitive under

```
Aubrey Hendrix:
@jury verdict:             $105,000
@future medical expenses:  -  4,250
                           --------
@corrected verdict:        $100,750
Wainwright Hendrix:
@jury verdict:             $ 60,000
@future medical expenses:  -  4,750
                           --------
@corrected verdict:        $ 55,250
Tyres D. Watson:
@jury verdict:             $ 85,000
@future medical expenses:  -  3,000
                           --------
@corrected vedict:         $ 82,000
William H. DeLoach:
@jury verdict:             $100,000
@future medical expenses:  -  5,000
                           --------
@corrected verdict:        $ 95,000
```

the circumstances, and remittiturs will eliminate all possible prejudicial effects of the erroneous jury instruction. The appellees' counsel, in their closing arguments to the jury, provided us with the formula for calculating the highest amounts the jury could have awarded appellees for future medical expenses. Subtracting these amounts from the jury's verdicts, we can arrive at damages awards unaffected by the erroneous jury instruction. Accordingly, we remit the respective jury verdicts as follows:

## VI.

Prior to the trial of this case, appellees and their wives settled their claims against the numerous other co-defendants, receiving compensation in return for covenants not to sue. The settlement agreements allocated sixty percent of the compensation to the appellees, in satisfaction of their personal injury claims, and forty percent to their wives, in satisfaction of their loss of consortium claims. After the court entered the final judgments now before us, appellants moved the court to amend the judgments to set-off the amounts the appellees *and* their wives received under these settlements. *See* Fed.R.Civ.P. 59(e). Appellees conceded that set-offs were appropriate, but argued that the amounts paid to their wives should not be included. Appellants urged the court to include the sums paid to the wives because there was no evidence in the record from which the court could determine the portion of the settlements properly allocable to the

loss of consortium claims.

In an effort to obtain such evidence, the court had appellants take the depositions of appellees, their wives, and their attorneys. The testimony disclosed adequate factual bases for the wives' claims and the trial court accepted the settlement allocations as reasonable. The jury verdicts were therefore reduced by sixty percent of the total settlement amount, which had been allocated to the appellees. Appellants contend that the district court's acceptance of the settlement allocations was both "arbitrary" and precluded by the applicable case law. [FN24] We disagree.

> FN24. Appellants do not allege that the settlement agreement and allocations were fraudulent or collusive.

[18][19] Under Georgia law, which provided the rule of decision in these cases, an injured person may obtain only one recovery of damages for his

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

injuries. *Ford Motor Co. v. Lee,* 237 Ga. 554, 229 S.E.2d 379, 381 (1976); *Gilmore v. Fulton-DeKalb Hospital Authority,* 132 Ga.App. 879, 209 S.E.2d 676, 678 (1974). It follows then

> that when one of two joint tortfeasors settles with a plaintiff and takes a covenant not to sue, the remaining tortfeasor, or defendant, is entitled to have credited against any damages that the jury might find against it the payment made by the other for the covenant not to sue, up to the full amount, thereof.

*Malone v. City of Rossville,* 107 Ga.App. 271, 129 S.E.2d 563, 564 (1963); see *American Chain & Cable Co. v. Brunson,* 157 *1509 Ga.App. 833, 278 S.E.2d 719, 723 (1981). A loss of consortium claim, although derivative, is a separate and distinct cause of action; the damages sustained by a spouse are exclusive of those suffered by her husband. *See Smith v. Tri-State Culvert Manufacturing Co.,* 126 Ga.App. 508, 191 S.E.2d 92, 94 (1972) *Hightower v. Landrum,* 109 Ga.App. 510, 136 S.E.2d 425, 428-29 (1964). Thus, a plaintiff's judgment should not be set-off by the amount his or her spouse received in settlement of a loss of consortium claim. Given this principle of law, the district court properly rejected the demand to reduce appellees' judgments by the amounts their wives received in settlement. In addition, we cannot say that the district court's finding that the settlement allocation was reasonable was clearly erroneous.

## VII.

Appellants have presented several additional claims of error. None requires discussion as all are devoid of merit. We find no reversible error in this record save the jury instruction regarding future medical expenses. To cure that error, we order remittiturs which the district court, on receipt of our mandate, shall implement by amending appellees' judgments as directed.

AFFIRMED in part; REVERSED in part and REMANDED with instructions.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048   Document 24   Filed in TXSD on 04/19/2001   Page 42 of 49

United States Court of Appeals Fifth Circuit.

Nathalie L. DUPONT, Plaintiff-Appellant,

v.

SOUTHERN PACIFIC COMPANY, Defendant-
Appellee.
Velma Margaret DUPONT, Indiv. and next
friend for Mark Villejoin, Plaintiff-
Appellant,

v.

SOUTHERN PACIFIC COMPANY, Defendant-
Appellee.
Nathalie LEGER et al., Plaintiffs-Appellants,

v.

SOUTHERN PACIFIC COMPANY, Defendant-
Appellee.
Anna Louise Dupont TRAHAN, Indiv. and next
friend of Michael Joseph Trahan,
Plaintiff-Appellant,

v.

SOUTHERN PACIFIC COMPANY, Defendant-
Appellee.

No. 22412.

Sept. 21, 1966, Rehearing Denied Oct. 24, 1966.

Consolidated actions by survivors of deceased
occupants of automobile against railroad for death of
occupants arising out of railroad crossing accident.
The United States District Court for the Western
District of Louisiana, Richard J. Putnam, J., entered
a judgment for the railroad and the survivors
appealed. The Court of Appeals, Fisher, District
Judge, held that where survivors of three guest
automobile passengers brought action against
railroad contending that the railroad crossing
accident was the result of the concurrent negligence
of the automobile driver and the railroad and the
survivor of the driver also brought action against
railroad, order of trial court consolidating all actions
for trial and designating counsel for survivors of
passengers as the lead counsel for all plaintiffs
constituted reversible error as there was a definite
conflict of interest which prejudiced all parties.

Reversed and remanded.

Thornberry, Circuit Judge, dissented in part.

See also D.C., 231 F.Supp. 601.

West Headnotes

**[1] Federal Civil Procedure** ⚖️8.1
170Ak8.1
    (Formerly 170Ak8)

**[1] Federal Courts** ⚖️813
170Bk813
    (Formerly 106k406.5(12))

When there is involved a common question of fact
and law as to liability of defendant trial judges are
urged to make good use of consolidation rule in
order to expedite trial and eliminate unnecessary
repetition and confusion; and where parties are
represented by different counsel and trial court
permits full and complete development of evidence
by all parties, equal opportunity for argument and a
clear and complete charge on the facts and law
applicable to respective theories of all parties, order
of consolidation will not be disturbed on appeal
except for abuse of discretion. Fed.Rules Civ.Proc.
rule 42(a), 28 U.S.C.A.

**[2] Federal Civil Procedure** ⚖️8.1
170Ak8.1
    (Formerly 170Ak8)

In resorting to use of rule relating to consolidation
of actions involving common questions of law or
fact trial judge should be most cautious not to abuse
his judicial discretion and to make sure that the
rights of parties are not prejudiced by order of
consolidation under the facts and circumstances of
the particular case. Fed.Rules Civ.Proc. rule 42(a),
28 U.S.C.A.

**[3] Federal Civil Procedure** ⚖️8.1
170Ak8.1
    (Formerly 170Ak8)

**[3] Federal Courts** ⚖️893
170Bk893

Where prejudice to the rights of parties obviously
results from an order of consolidation of actions
pending before the court, action of judge is
reversible error. Fed.Rules Civ.Proc. rule 42(a),
28 U.S.C.A.

**[4] Federal Civil Procedure** ⚖️1953
170Ak1953

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

366 F.2d 193
(Cite as: 366 F.2d 193)

Page 2

**[4] Federal Courts** ☜➠893
170Bk893

Where the survivors of three deceased automobile passengers brought action against railroad contending that the railroad crossing accident was the result of the concurrent negligence of the automobile driver and the railroad and the survivor of the deceased driver also brought action against railroad, order of trial court consolidating all actions for trial and designating counsel for survivors of passengers as the lead counsel for all plaintiffs constituted reversible error as there was a definite conflict of interest which prejudiced all parties. Fed.Rules Civ.Proc. rule 42(a), 28 U.S.C.A.

**[5] Federal Civil Procedure** ☜➠2176.2
170Ak2176.2
    (Formerly 170Ak2176)

Where charge by trial court in railroad crossing accident was not given in specific language requested but it substantially and adequately covered issues raised by evidence, action of trial court in refusing requested charge was not error.

**[6] Railroads** ☜➠350(13)
320k350(13)

**[6] Railroads** ☜➠350(32)
320k350(32)

Evidence in railroad crossing accident case showing, among other things, that train was operating in excess of 75 miles per hour as it approached grade crossing was sufficient to present jury questions as to whether each of the deceased passengers in automobile had been guilty of contributory negligence and whether railroad's negligence was a proximate cause of collision between train and automobile.

**[7] Federal Courts** ☜➠641
170Bk641
    (Formerly 30k237(5))

Where there was no request made for a directed verdict under rule, appellate court was powerless to review sufficiency of evidence.

**[8] Federal Courts** ☜➠826
170Bk826
    (Formerly 106k406.5(21))

To reverse a trial court's decision denying a motion for a new trial based on ground that verdict was not supported by evidence there must have been a clear abuse of discretion, and if a reasonable basis exists for jury verdict there may be no reversal.

*194 J. Minos Simon, John Rixie Mouton, Lafayette, La., for appellants.

J. J. Davidson, Jr., Richard C. Meaux, Lafayette, La., for appellee.

Before BELL and THORNBERRY, Circuit Judges, and FISHER, District Judge.

FISHER, District Judge.

  These consolidated cases involve a railroad crossing collision between the Sunset Limited, a Southern Pacific train, and a 1953 Chevrolet automobile occupied by the driver and three guest passengers, all of whom were killed in the accident of June 25, 1961. The appellants are the survivors of the driver of the automobile and the three guest passengers. Originally a separate suit was filed on behalf of each of the survivors of the passengers and the driver. As a result of rulings on motions filed by appellee, the trial court ordered that single suits be filed on behalf of all survivors of each of the three passengers. A similar ruling was made in respect to survivors of the driver. Thus, four separate suits were filed.

  On August 15, 1963, the trial court, sua sponte, ordered all four cases to be consolidated for purposes of trial, pursuant to Rule 42(a), Federal Rules of Civil Procedure, [FN1] and further ordered the separation of the issue of liability from the issue of damages, with the liability issue to be tried first. The pre-trial order further provided that the attorneys representing appellants were required to designate a lead counsel for the purposes of the trial. [FN2]

    FN1. Rule 42(a) Consolidation. 'When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.'

    FN2. 'The attorneys representing plaintiffs in all actions will designate a trial attorney who will

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048  Document 24  Filed in TXSD on 04/19/2001  Page 44 of 49

participate as the leading attorney at the trial of these cases on the question of liability. The attorney so designated will examine and cross-examine all witnesses for either plaintiff or defendant used at the trial of this issue, provided, however, that he may designate one of the other attorneys to interrogate on direct or cross-examination any one or more witnesses for either plaintiff or defendant but the attorneys so designated shall conduct the entire examination of such witness or witnesses.' (R. 184)

Counsel for the survivors of the passengers filed a motion to recall the pretrial *195 order of August 15, 1963, in which they expressly objected to the consolidation of their cause of action with a suit filed by the survivors of the driver, citing as grounds that such a consolidation would create confusion and prejudice; further contending that the appointment of the lead counsel would result in a conflict of interests between the survivors of the driver and the survivors of the passengers. [FN3]

FN3. (1) 'It is movants' contention that the negligence of both the operator of the automobile and the operators of the train in question concurred to being about the death of the guest passengers. The consolidation order of August 15, 1963, necessarily operated to create confusion and is prejudicial to the interests of movants, especially in view of the fact that the negligence of the driver of the vehicle is not imputable to the guest passengers.'
(2) 'Movants further aver that there is a conflict of interest between movants and the litigants, or survivors of the driver of the automobile, inasmuch as movants contend and intend to prove that the death of the guest passengers resulted from the concurrent negligence of the driver of the automobile and the operators of the defendant's train.' (R. 205-206)

At a pre-trial conference on August 22, 1963, the court denied appellants' motion to recall the order of August 15th, and at that time counsel for the survivors of the passengers, under order of the court, was designated as lead counsel for all plaintiffs, [FN4] although the pre-trial order was modified to provide that at the trial as circumstances warranted each party might have full right of examination of all witnesses. Lead counsel was, under order of the court, required to act as advocate of the survivors of the driver in addition to representing his clients, the survivors of the

passengers.

FN4. The Court then made the following comment: 'Of course, Mr. Simon will conduct the examination in chief of each witness, and if at the conclusion of his examination, Mr. Mouton (counsel for the survivors of the driver) feels there are any questions that he should ask, the court will give him permission to do so * * * I will let Mr. Mouton make an opening statement as well as Mr. Simon, and in the event there are additional questions, after Mr. Simon finishes his examination of any witness, he will be permitted to go into questions touching upon negligence of the driver.' (R. 241-242)

The four cases as consolidated were tried to a jury; and after several hours of deliberating, the jury returned a verdict in favor of defendant against the survivors of the driver. Whereupon, without disclosing what the verdict was, the trial court instructed the jury to continue its deliberations and to return a verdict in all four cases. Sometime thereafter the jury returned four general verdicts in favor of the defendant and against all of the plaintiffs.

Appellants motion for new trial was overruled and this appeal followed.

The appellants make the following assignment of errors:

1. That the consolidation of the four cases and the requirements by the court that the plaintiffs designate a lead counsel to represent all plaintiffs constituted reversible error.

2. That the trial court erred in failing to give the jury certain instructions requested by plaintiffs.

3. That the trial court erred as a matter of law in not finding in favor of the survivors of the guest passengers.

The only assignment of error appearing to be meritorious is number one and we believe this assignment should be sustained and the cases reversed and remanded.

[1] Trial judges are urged to make good use of Rule 42(a) of the Federal Rules of Civil Procedure where there is involved a common question of fact and law as to the liability of the defendant in order to

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048 Document 24 Filed in TXSD on 04/19/2001 Page 45 of 49

expedite the trial and eliminate unnecessary repetition and confusion; and where the parties are represented by different counsel and the trial court permits full and complete development of the evidence by all parties, equal opportunity for argument, a clear and complete charge on the facts and the law applicable to the respective theories of all parties, *196 the order of consolidation by the trial judge will not be disturbed on appeal except for abuse of discretion. Whiteman v. Pitrie, 220 F.2d 914 (5th Cir. 1955); Plough v. Baltimore & O.R. Co.,172 F.2d 396 (2nd Cir. 1949); Davis v. Yellow Cab Co. of St. Petersburg,220 F.2d 790 (5th Cir. 1955); 5 Moore's Fed. Practice, Par. 42.02, p. 1204 (2nd ed. 1964); Walker v. Loop Fish & Oyster Co., 211 F.2d 777 (5th Cir. 1954); Polito v. Molasky, 123 F.2d 258 (8th Cir. 1941).

[2][3] However, in resorting to the use of Rule 42(a) the trial judge should be most cautious not to abuse his judicial discretion and to make sure that the rights of the parties are not prejudiced by the order of consolidation under the facts and circumstances of the particular case. Where prejudice to rights of the parties obviously results from the order of consolidation, the action of the trial judge has been held reversible error. Atkinson v. Roth, 297 F.2d 570 (3rd Cir. 1961); United States v. Knauer, 149 F.2d 519 (7th Cir. 1945); Capstraw v. New York Central R.R. Co. (Sielagowski v. New York Central R.R. Co.), D.C., 15 F.R.D. 267; Bascom Launder Corp. v. Telecoin Corp., D.C., 15 F.R.D. 277; Ex Parte Miller, 273 Ala. 453, 142 So.2d 910.

In Atkinson v. Roth, supra, seven actions were instituted in the court below stating claims arising out of a collision between an automobile driven by one Atkinson and a tractor-trailer driven by one Roth. Atkinson had five passengers in his vehicle. A number of separate actions were commenced by the numerous plaintiffs, some against both Atkinson and Roth, and others against one or the other with the remaining parties being brought in as third-party defendants.

On motion of Roth and his alleged employers, all the actions were consolidated for trial over the objections of plaintiffs. The Court of Appeals for the Third Circuit held,

'All of the suits stating claims by passengers or their representatives, however, could proceed

without conflict. But Atkinson (driver) as a plaintiff was obliged to keep his case free of contributory negligence, and in this he was at cross purposes with the other plaintiffs. The presence of Atkinson, quo defendant, in the same trial with Atkinson, quo plaintiff, emphasizes the conflict. In these circumstances, proper concern for due administration of justice seems to indicate to us the wisdom of avoiding another trial in which Atkinson appears as a plaintiff along with his passengers or their representatives.'

[4] Thus, in Atkinson v. Roth, supra, the confusion and harm resulted from the consolidation of various causes of action in which the plaintiff driver appeared as both plaintiff and defendant and the Third Circuit Court of Appeals held that such a situation could not be other than prejudicial to the party plaintiffs. In the instant case we do not have the driver of the automobile appearing as party defendant and no cause of action is brought against his estate, but we do have the survivors of the guest passengers making the contention that the accident resulted from the concurrent negligence of the driver of the automobile and the defendant. The trial court entering the order of consolidation went further and also ordered the designation of a lead counsel for all plaintiffs. Thus, the harm lies not only in the confusion resulting from the consolidation, but also in the fact that the rights of the parties are prejudiced because of the definite conflict of interest which is emphasized by the order of the court requiring the lead counsel to represent both sets of plaintiffs. In representing all plaintiffs, lead counsel must contest contributory negligence on the part of the driver, but in doing so he increases his burden and prejudices the interest of his clients, the survivors of the passengers, since the negligence of the driver not being imputed to the passengers will permit the survivors of the passengers to recover notwithstanding a finding of contributory negligence on the part of the driver. To advise the jury of this fact and to make this contention in representing the survivors of the passengers, *197 lead counsel fails in his duty and obligation to the survivors of the driver. He, therefore, cannot properly and adequately represent either set of plaintiffs if required to represent all plaintiffs. The order of consolidation, together with the order requiring lead counsel for all plaintiffs, created an impossible situation which resulted in neither set of plaintiffs receiving the representation to which they are entitled.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048   Document 24   Filed in TXSD on 04/19/2001   Page 46 of 49

[5] In view of the disposition made of this appeal, a discussion of assignment number two, which is the same for both sets of plaintiffs in the court below is not indicated other than to comment that the trial court did not err in refusing to give the requested charges No. 7 and No. 10. [FN5] The charge given by the Court, while not in the specific language requested, we believe substantially and adequately covered the issues raised by the evidence and the action of the trial in refusing the requested charges was not error.

> FN5. Charge No. 7: 'If a crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train, the railroad company will be liable in damages, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warnings, or providing signaling devices, et cetera. 'The theory of this legal rule is that the railroad may not rely upon the duty of the motorist to stop and look, if the physical circumstances are such that stopping and looking will do the motorist no good.'
>
> Charge No. 10: 'Because of the basic human instinct of self-preservation, the law presumes that a driver did not commit suicide by going onto the railroad track if he had actual knowledge of the approaching train.
>
> 'This presumption arises in cases where the driver is killed. Consequently, it is presumed that the driver in this case did not actually know of the approaching train, and the test as to whether he was contributorily negligent is whether he should have become aware of the danger if he had stopped to look and listen before reaching the tracks, and whether, if he had stopped within the distance stated in the law, he could have perceived the danger of the approaching train which he could not perceive as well while continuing forward without stopping.'

[6] As to assignment number three, made by the survivors of the passengers, the trial court was correct in refusing to enter judgment as a matter of law and in refusing to grant a new trial because obviously a jury question existed.

In support of their position, survivors of the guest passengers point out,

'That defendant has admitted by stipulation that at the time of the collision the train was being operated at a speed in excess of 75 miles per hour, the maximum self-imposed speed limit at the grade crossing in question, and therefore as a matter of law the defendant was guilty of negligence. On the other hand, as a matter of law the guest passengers could not be guilty of contributory negligence because they owed the duty to warn only if they realized the driver was not going to stop, and under the admission of the defendant, the guest passengers had every reason to believe that the driver was going to stop, since Mr. Reed, the engineer and witness for the defendant, testified that the driver of the automobile approached the grade crossing at a rate of speed of about 10 miles per hour and when he got within a few feet of the tracks he brought his vehicle to 'almost stop' convincing Mr. Reed that the driver would stop, and then suddenly accelerated the vehicle when the train was about 100 feet from the intersection, in consequence of which the train hit the car 'smack in the middle' as it straddled the railroad track.' [FN6]

> FN6. Testimony of defense witness, Mr. Reed. (R. 157-163).

Accepting the interpretation of the testimony as viewed by the appellant in its most favorable light, there were clearly jury questions to be determined as to whether each of the passenger occupants of the automobile was guilty of contributory negligence, and whether defendant's negligence was a proximate cause.

*198 [7] Further, as is pointed out by appellee, there was no request for a directed verdict under Rule 50, Federal Rules of Civil Procedure, 28 U.S.C.A., and thus the appellate court is powerless to review the sufficiency of the evidence. See Stokes v. Continental Assurance Co., 242 F.2d 893 (5th Cir. 1957); Pruett v. Marshall, 283 F.2d 436 (5th Cir. 1960).

[8] An appellate court may reverse a district court for denying a new trial based on the verdict not being supported by the evidence if the denial was an abuse of discretion. Pruett v. Marshall, supra. However, there must be a clear abuse of discretion, and if a reasonable basis exists for a jury verdict, there may be no reversal. Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916, in which the Court held,

'* * * it would be an undue invasion of the jury's historic function for an appellate court to weigh the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00048   Document 24   Filed in TXSD on 04/19/2001   Page 47 of 49

conflicting evidence, judge the creditability of witnesses and arrive at a conclusion opposite from the one reached by the jury.'

In view of the jury verdict and the manner in which it was returned, we must conclude that some confusion existed with the probability that the jury in some way imputed the negligence of the driver to the guest passengers contrary to the instructions of the court, all of which resulted to the prejudice of the parties caused by the order of consolidation with the designation of a lead counsel to represent all of the plaintiffs.

These consolidated cases are, therefore, reversed and remanded for further proceedings not inconsistent with this opinion.

THORNBERRY, Circuit Judge (concurring in part and dissenting in part):

I agree with the majority that the judgment of the trial court must be reversed and remanded as to the survivors of the passengers. I must respectfully dissent, however, from that portion of the Court's decision reversing and remanding the lower court's judgment as to the survivors of the driver.

As stated by the majority, consolidation under Rule 42(a) is within the sound discretion of the trial court, and action pursuant thereto will be overturned upon appeal only for an abuse of discretion. Stemler v. Burke, 6th Cir. 1965, 344 F.2d 393; Nelson v. Grooms, 5th Cir. 1962, 307 F.2d 76; Davis v. Yellow Cab Co., 5th Cir. 1955, 220 F.2d 790; Gillette Motor Tr. v. Northern Oklahoma Butane Co., 10th Cir. 1950, 179 F.2d 711. The standard of appellate review by which the exercise of the trial court's discretion is to be judged is predicated upon Rule 61 of the Federal Rules of Civil Procedure:

No error or defect in any ruling or order * * * by the court * * * is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Thus, to find an abuse of discretion the appellate court must feel that, on an examination of the record

as a whole, the action complained of adversely affected the substantial rights of the complaining party. Box v. Swindle, 5th Cir. 1962, 306 F.2d 882; Bell v. Swift & Co., 5th Cir. 1960, 283 F.2d 407; Barron & Holtzoff §§ 1351, 1357 (Wright ed.).

Applying this standard, I am not convinced that the substantial rights of the driver's survivors were prejudiced by the trial court's action. Their case was more difficult than that of the passengers' survivors; they alone were required to refute any evidence of contributory negligence on the part of the driver. [FN1] Thus, *199 any confusion in the minds of the jurors resulting from the consolidation would tend to prejudice the case of the passengers' survivors, not that of the driver's.

> FN1. It would appear that the Louisiana law on imputation of negligence is unusually favorable to guest passengers of motor vehicles. Such passengers are not required to keep a look-out, but may entrust their safety to the driver, where they have no reason to believe that he is incompetent. Even where the passenger becomes aware of danger that the driver apparently does not see, the duty to warn depends upon the opportunity to do so. Also, without indication to the contrary, a passenger may assume that the driver sees and will heed traffic signals and defer to approaching traffic. See Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Dowden v. Southern Farm Bureau Cas. Ins. Co., 158 So.2d 399 (Ct.App.La.1963); LeBlanc v. Southern Farm Bureau Cas. Ins. Co., 157 So.2d 329 (Ct.App.La.1963).

The record also fails to reveal that the appointment of the attorney of the passengers' survivors as lead counsel prejudiced the survivors of the driver. The trial judge expressly provided in his order that the attorneys for both groups of plaintiffs would be allowed to examine or cross-examine all witnesses as well as make separate arguments to the jury. Counsel for the survivors of the driver availed himself of this privilege on several occasions. Furthermore, the trial judge's order appointing lead counsel stated that the procedure could be altered on the motion of any party if the circumstances so required. No such motion was presented during the trial. Upon this state of the record, I cannot conclude that the survivors of the driver were denied effective assistance of counsel.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The majority relies heavily upon Atkinson v. Roth, 3rd Cir. 1961, 297 F.2d 570. That case is not controlling here as the factual situation involved differed significantly. This is apparent merely from the brief resume of Atkinson set out in the majority opinion. Furthermore, aside from the fact that Atkinson was both plaintiff and defendant in the consolidated cases, a deciding factor appears to have been the unsatisfactory presentation of the case to the jury in the charge and instructions. [FN2] We have no such situation in the present case.

FN2. An example of this is the following language: We note, too, that the court below did not include in its charge to the jury a direction that the

negligence of Atkinson could not be imputed to his passengers. 297 F.2d at 575.

The proper regulation of trial proceedings is the duty and function of the trial judge, and the appellate court should treat with due deference his actions in this area. The survivors of the driver have not demonstrated that their case was so prejudiced as to require a finding of abuse of discretion and the ordering of further litigation, burdensome to both the appellee and the courts. Therefore, the judgment as to these parties should be affirmed.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

· 2·

# R. BLAKE BRUNKENHOEFER, P.C.

### A PROFESSIONAL LAW CORPORATION

---

AMERICAN BANK PLAZA
711 N. CARANCAHUA, SUITE 1000
CORPUS CHRISTI, TEXAS 78475

TELEPHONE (361) 888-6655
FACSIMILE (361) 888-5855
BRUNKLAW@AOL.COM

April 16, 2001

Rick Waterhouse
PIPITONE, SEGER & WATERHOUSE
615 Upper N. Broadway, Suite 1770
Corpus Christi, Texas 78477

<u>C.M./R.R.R. #7000 0600 0025 8533 9998</u>

RE:   Civil Action No. B-00-048; *Donald Leslie "Sam" Galbreath v. Promar Inc.,
Individually and d/b/a Coastal Production Services and d/b/a Production
Services Group, et al.*; In the United States District Court for the Southern
District of Texas, Brownsville Division

and

Civil Action No. C-01-12; *Donald Leslie "Sam" Galbreath vs. Promar Inc.,
Individually and d/b/a Coastal Production Services;* In the United States
District Court for the Southern District of Texas, Corpus Christi Division

Dear Rick:

Enclosed please find complete copies of the twenty-four (24) photos taken by Plaintiff's
liability expert, Dick Frenzel, relative to the April 6, 2001 inspection of the M/V LADY BECKY.

These materials are provided to you in supplementation of Plaintiff's disclosures and all
discovery conducted in both of the above-referenced causes of action.

Until next we meet or speak, I remain

Yours truly,

R. Blake Brunkenhoefer

RBB/lrb

Encl: (as stated)

RECEIVED
APR 17 2001